21 N.J. Super. 394 (1952)
91 A.2d 273
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
STANLEY HATCH, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1952.
Decided September 25, 1952.
*395 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Albert M. Ash, Prosecutor of Cape May County, argued the cause for plaintiff-respondent.
Mr. Raymond P. Alexander argued the cause for defendant-appellant (Mr. H. Albert Hyett, attorney; Mr. Clifford R. Moore on the brief).
The opinion of the court was delivered by FRANCIS, J.C.C.
The defendant here appeals from his conviction under an indictment which charged that he "unlawfully did procure John William Smith to wilfully swear falsely in a judicial proceeding before the County Judge in Cape May County Court on July 11, 1951, that he, the said John William Smith, had had sexual relations with Irene Dickerson * * *." In dealing with the matter it is *396 necessary only to consider the grounds of appeal relating to the admission of certain evidence at the trial.
Bastardy proceedings were brought against the appellant, Hatch in the Municipal Court in Lower Township, Cape May County. The complaint charged that he was responsible for the pregnancy of Irene Dickerson, to whom a child was born on February 8, 1951. The trial resulted in his conviction of bastardy and an order requiring him to pay $7.50 a week for support of the child.
An appeal was taken to the County Court where the action was heard de novo. At this time one John William Smith, who had not appeared in the Municipal Court, testified as a defense witness. No stenographic record was made of this proceeding and the exact nature of his testimonial assertions is not clear. According to a prosecution witness in this trial Smith said he had had intercourse with Irene Dickerson on three occasions which could have made him answerable for her pregnancy. A defense witness, who was present also at the trial de novo, asserted that Smith testified that he had such intercourse on three occasions prior to the end of February 1949. And Smith himself, in his appearance on this indictment, seems to have agreed with the latter version of his testimony.
In any event the trial de novo resulted in a jury verdict of not guilty and Hatch was discharged.
Subsequently Smith recanted his testimony, saying that he had never had sexual relations with the young lady and that he had testified to the fact of intercourse at the request of the defendant Hatch.
On the retraction an application for a new trial of the bastardy appeal was made to the County Court. A hearing was conducted in which the parties and their witnesses were heard and defendant's documentary proof was introduced in the form of a signed statement by Smith admitting his relations with the young lady and a letter admittedly written for him to Hatch after the disavowal of his testimony, in which, according to Hatch, he reiterated its truth but said that *397 because of threats of jail and bastardy proceedings against him he was forced to recant. At the conclusion of the hearing the motion for the new trial was denied but both Smith and Hatch were held, one on a charge of false swearing, and the other for procuring false swearing. Thereafter each was indicted for the offense charged and Smith pleaded guilty.
Examination of the indictment against Hatch makes it plain that the issue to be tried out was: Did he procure Smith to swear falsely wilfully that he had had sexual intercourse with Irene Dickerson?
At the trial appellant denied the accusation and maintained that Smith had by oral and written statements before and after the trial de novo of the bastardy case admitted to him and to others the fact of the intercourse.
On cross-examination the prosecutor confronted him with a document apparently entitled "Reverend Stanley Hatch Fact Sheet"; also with a letter signed by him and dated January 1952, which indicated that the "sheet" had been circulated by him among his parishioners. Then, over objection on the ground of irrelevancy, the following questions were asked and allowed by the court:
"Q. Did you ever allege that an attorney, a member of the bar, had threatened Smith, who appeared here yesterday in these proceedings, with a jail sentence to force him to testify falsely against Reverend Hatch at the new trial?
A. No. I didn't. But John Smith sent me a letter from Fort Dix saying that Lawyer ____ had contacted him and was around telling everybody that I was saying that John was a fool, a sucker, and I don't just remember all of it, but anyway John said he had changed his statement that  he said he changed his statement and he knew that he was going to be held for perjury or something. Then he said, `get in touch with me right away.' (Name omitted).
Q. Then you are making a denial of my charge there, is that right?
A. That is what the letter said he sent me.
Q. Referring to S-3 for identification, I am going to read a portion of that and you have already "
The question was interrupted by a further objection on the ground that the prosecutor could not cross-examine the witness on a collateral matter and then undertake to contradict *398 the answer given. However, the court permitted the question for the purpose of an attack on the defendant's credibility. Then the question continued:
"Q. Now, Mr. Hatch, I refer you now to the enclosure which you have identified in your letter as S-2 for identification, which is entitled `Reverend Stanley Hatch Fact Sheet' 
The Court: Won't you show me relating to the question not the generalization.
Q. ____ I am referring to paragraph 10 of that `fact sheet' and read to you this statement: `The white conspirators having exhausted the means through their tool Irene Dickerson pounce upon John Smith and through the conspirator Lawyer ____ threaten Smith with a jail sentence and bastardy proceedings and forced him to testify falsely against Reverend Hatch at a new trial claiming that Reverend Hatch had got him to swear falsely at the previous trial, that he had had sexual intercourse with Irene Dickerson.' Did you write that statement? (Name omitted)
A. The letter that John sent me stated that.
Q. Which is true, the answer which you gave me before or this answer?
A. It could have been I misunderstood you. John sent me that letter from Fort Dix, the letter I turned over to Lawyer Nutter was presented in the case here, the letter Judge Horuvitz read."
It appeared also that the written statement of Smith and his letter to Hatch, which had been used on the application to set aside the not guilty verdict on the bastardy appeal, had disappeared from the courtroom at the close of that hearing. Consequently they were not available at this trial. On this subject, again over objection which the court had allowed to run against the entire line of questioning about the so-called "Fact Sheet" (cf. State v. Hendrick, 70 N.J.L. 41, 44 (Sup. Ct. 1903)), the prosecutor was permitted to ask:
"Q. I am going to read you a statement, Reverend, and if you make a direct denial or admission I won't make the offer: `The letters introduced into evidence to clearly prove that Reverend Hatch was innocent were stolen by an official of the Court and turned over to conspirators to keep Reverend Hatch from getting a fair and impartial trial.' Did you make that statement? A. Yes.
Q. One more point, did you ever state that you were convicted by a prejudiced and a fixed jury?
A. I think the record will spell that.
Q. Did you state that? A. Yes.
*399 It is obvious that this "Fact Sheet" of itself was not germane to the issue being tried under the indictment. It had neither relevancy nor materiality on the subject of whether or not the appellant procured Smith wilfully to swear falsely about his relations with the mother of the illegitimate child. Nor were the parts of it used on this cross-examination contradictory of anything that had been said on direct examination.
The prosecutor sought in the trial court, and seeks here, to justify its use as a proper attack on the appellant's credibility. Actually what he did was to make inquiry on cross-examination about these irrelevant and immaterial subjects which were wholly collateral to the trial, and then when a denial or even an equivocation was elicited, use the statement in contradiction. This cannot be done. It has long been the rule in this State that "Testimony, drawn out by cross-examination, can be contradicted only on matters germane to the issue being tried." Kiernan v. Mauer, 13 N.J. Super. 18, 22 (App. Div. 1951); State v. Mor, 85 N.J.L. 558 (Sup. Ct. 1914); State v. Simon, 113 N.J.L. 521, 534 (Sup. Ct. 1934), affirmed 115 N.J.L. 207 (E. & A. 1935); Wigmore on Evidence, secs. 1001 to 1006. And in State v. Hendrick, 70 N.J.L. 41 (Sup. Ct. 1903), the Supreme Court said:
"A witness may be discredited by evidence attacking his character for truth and veracity but not by the proof of particular independent facts, though bearing upon the question of veracity."
There is no distinction in the application of the principle where the witness is the defendant in a criminal proceeding. (Id. 45.)
Even assuming, for purpose of discussion, that the matters were collateral ones of the type concerning which interrogation may be made in order to impair the credibility of the witness, the answers given by the witness are conclusive against the questioner and cannot be contradicted by other *400 evidence. The applicable rule is stated clearly in State v. Mor, supra, as follows:
"The law is firmly settled that where a party has the right, for the purpose of impairing the credit of a witness as to collateral matters, to ask questions as to those collateral matters, but having asked and obtained answers, he must abide by the answers given; other witnesses could not be called to prove such answers untrue. Stokes v. People, 53 N.Y. 164, 13 Am. Rep. 492.
"In 1 Greenleaf Evid. (Ed. 1896) Sec. 449, the learned author enunciates the legal rule to be as follows: `But it is a well-settled rule that a witness cannot be cross-examined as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him by other evidence, if he should deny it, thereby to discredit his testimony. And if a question is put to a witness which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked the question; but it is conclusive against him.' The author cites numerous American and English cases in support of the text."
State v. Bartell, 15 N.J. Super. 450, 459 (App. Div. 1951); State v. De Paola, 5 N.J. 1, 13 (1950); State v. Conner, 97 N.J.L. 423, 425 (Sup. Ct. 1922); State v. Hendrick, supra.
While, generally, the course and scope of cross-examination are within the discretion of the trial judge, that discretion is not uncanalized; it must be exercised with regard to fundamental rules of evidence. Here manifestly prejudicial evidence, wholly immaterial and irrelevant to the basic issue, and without justification as an attack upon credibility, was admitted.
Other rulings are challenged by appellant and since the conviction must be reversed it seems necessary to consider them.
With further reference to the "Fact Sheet" it appears that defense counsel had agreed to stipulate that the state "proposes to call" four members of the bar who had some connection with the earlier proceedings, "who, if they would take the stand would testify that there was no conspiracy amongst them against the defendant, Reverend Hatch, or with any other persons." This stipulation was made with the understanding that its evidential character was objected to. The objection was made and overruled. This testimony *401 is subject to the same criticism as that already discussed. It relates to a purely collateral, irrelevant matter which the state itself improperly injected into the case.
The record shows also that the State was allowed to prove through the wife of the witness Smith, again over appropriate objection, a conversation between Smith and one of the attorneys for the defendant. The conversation took place after Smith had recanted and it concerned a return to his original position. According to the testimony Smith said he would not do so, whereupon the attorney asked him not to tell any one about his visit and then left the house. It is undisputed that Hatch was not present at the time. This testimony was therefore hearsay and should have been excluded. State v. Newman, 73 N.J.L. 202 (Sup. Ct. 1906).
For these reasons the judgment of conviction is reversed and a new trial ordered.