38 N.J. Super. 568 (1956)
120 A.2d 128
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ERASMUS J. SCALA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 1956.
Decided January 24, 1956.
*569 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Morris Spritzer argued the cause for appellant.
Mr. John B. Molineux, Assistant County Prosecutor, argued the cause for respondent (Mr. Alex Eber, Middlesex County Prosecutor, attorney).
*570 The opinion of the court was delivered by JAYNE, J.A.D.
The defendant, Scala, on whose behalf the present appeal is prosecuted, was placed on trial in response to an indictment presented by the grand jury of Middlesex County alleging that on May 18, 1953 he and one Pasquale Schibilia conspired to steal and permanently appropriate the chattels of Permacel Tape Corporation in the Township of North Brunswick, in pursuance of which unlawful confederation Schibilia between May 18, 1953 and March 16, 1954 made quantities of the chattels at the plant of the Permacel Tape Corporation available to Scala, who removed and sold them.
The defendant Schibilia had pleaded guilty to the indictment and testified in support of the charge against Scala. The latter refrained from testifying in his own defense. Indeed, no testimony whatever was introduced on his behalf. A verdict of guilty was returned by the jury.
Essentially the asserted criticism of the conviction inheres in the denial of the defendant's motion for a mistrial. A concise explanation of the testimony and of the presentation of certain exhibits will reveal the reason that occasioned the request for the mistrial.
The Permacel Tape Corporation is engaged in the manufacture of rolls of sensitive adhesive tape of various designs and sizes. Pasquale Schibilia was a janitor at the manufacturing plant. His regular period of employment was from midnight to 8 A.M. In that capacity he worked alone, and his duty was to remove litter and worthless residue from the plant and deposit it in a yard behind the building. At that time the yard was not illuminated at night. Customarily a motor truck and trailer of the Permacel company used during the daytime to transport material from the warehouse to the manufacturing department of the plant was left in the yard during the night.
The defendant Scala had been previously employed at the plant and had thus acquired not only a personal acquaintance with Schibilia but also a personal knowledge of the premises *571 and of the operations and practices there pursued. With the opportunities so auspicious the two, both then living in the same house, developed the compact that Schibilia on mutually arranged occasions should stow a quantity of rolls of tape in the company's trailer conveniently parked in the darkness of the yard, and that Scala would during the night furtively abduct them from the trailer, thereafter sell them and reward Schibilia for his cooperating participation at the rate of ten cents a roll. There were 25 or more pillages usually made at 4 A.M. in furtherance of the object of the conspiracy. Scala "got lots of tape there," said Schibilia.
The management of the company discovered an unaccountable declension in its inventories and inaugurated a police investigation. Schibilia had requested his share of the proceeds of the sales, and Scala gave him a check for $175, but alas the check "bounced," a revolution in the confederacy thereupon ensued and Schibilia vociferated.
Able counsel advocated on behalf of the defendant that the rolls pilfered constituted worthless and useless material discarded by the company for destruction. Counsel's alluring interpretation of the activity became frail when it encountered the State's proof that the market price of a perfect roll was 75 cents and the defendant vended those he had so obtained at 50 cents a roll, and moreover that he had received from the sales which the State had identified a total sum of $1,322. The testimony of the witness Julius Silasi concerning the defendant's possession of the rolls of tape and his employment by the defendant to deliver them to the purchasers and collect the payments from the buyer materially fortified the strength of the State's case.
It seems unnecessary specifically to mention other persuasive ligaments of the incriminatory evidence. The purpose of this introductory portion of our opinion is to express the premise that there was an abundance of uncontroverted competent and legally admissible evidence to justify the jury in resolving the guilt of the defendant beyond a reasonable doubt.
*572 However, the remarks of Mr. Justice Jacobs in State v. Orecchio, 16 N.J. 125, 129 (1954) are germane to our present considerations:
"The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries. This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial, and in recent days this court has not hesitated to deny such relief to the defendant."
We come now to the pivotal question which implicates basically the propriety of the denial of a mistrial by the trial judge. At the inception of the trial, members of the State Police placed on the table in view of the jury three packages containing rolls of tape which had been confiscated and stored by them as exhibits in the case. There was proof that the rolls were the manufactured products of the Permacel company. Each package was marked for identification. Exhibit S-1 contained rolls of "old tape" manufactured in 1953 and early in 1954 which "had taken an awful beating in the interim." The other two packages, exhibits S-2 and S-3, held rolls of tape which, although manufactured in 1953, were nevertheless orderly packed and recognized to be "good tape."
Counsel for the defendant arose and said:
"If Your Honor please, I have withheld objection to the line of questioning on the assumption that it is the intention of the prosecution to connect these exhibits with the defendant. I would like to be permitted to inquire if it is that intention, so that I either can frame, or withhold an objection."
The assistant prosecutor replied:
"Your Honor, of course it is the intention and expectation of the State to definitely tie up all of these exhibits with the defendant, Scala."
*573 Concluding the colloquy, counsel for the defendant stated:
"I will then reserve the right to move to strike the testimony in the event of the failure of the prosecutor to make such connection."
At another stage of the trial while a witness was being interrogated concerning the exhibits, counsel for the defendant iterated his objection and the assistant prosecutor again announced:
"If your Honor please, of course we are going to tie this defendant up. I can't put all the witnesses on at once."
At the conclusion of the introduction of the evidence, and in the absence of the jury from the court room, the assistant prosecutor was obliged to acknowledge his inability to associate exhibits S-2 and S-3 with the defendant as he had previously represented. He explained that in making his representation he had relied on the information imparted by the office file only to discover that now the memory of the witness from whom the requisite testimony was to be elicited had weakened. Counsel for the defendant thereupon addressed to the court a motion for the declaration of a mistrial.
In denying the mistrial, the court stated:
"There is no question, of course, in the Court's mind, but that the State felt that the exhibits offered, S 2 and S 3, could be tied up. They find now that this cannot be done. S 1, however, does remain, of course, properly tied up with the defendant.
The statement made by counsel for the defendant, of course, is likewise so, in that he reserved the right to exclude S 1, S 2 and S 3, if they were not connected. S 2 and S 3 evidently cannot be connected.
While it is true that the two larger cartons containing tape were before the jury, the Court feels that the defendant would not be prejudiced, if they are presently removed from the court room, before the jury returns, and upon a proper instruction from the Court directing that they leave from their deliberations entirely anything in connection with S 2 and S 3, and base it solely on S 1, would, as a matter of fact, make the question  narrow the scope of the fact for the consideration of the jury. And I feel that a proper instruction from the Court to the jury, explaining the situation, and directing *574 that the testimony in connection therewith be expunged, and directing that they give no consideration to that, would clarify the situation and would not be prejudicial to the defendant."
A subsequent motion to strike the testimony of all of the witnesses relative to exhibits S-2 and S-3 was granted.
We peruse the record to ascertain the subsequent eventualities at the trial which are of definite pertinency to the consequential effect of the denial of a mistrial, and we note that counsel for the defendant in his summation to the jury stated:
"* * * Remaining on this counsel table, on this desk is Exhibit S 1, which you will note is a stack of ten miscellaneous, assorted rolls, of different kinds. The nice, neat, carefully packed package, wafer separated rolls, in Box S 2, is not here. The nice, neat, carefully packed, wafer separated rolls of Box S 3 is not here. They are not here because as the result of a motion made by me in your absence, they were ordered removed. The Court will charge that you are to disregard the presence of those two boxes, which were in front of your eyes very conspicuously for a day and a half. The Court will charge you that you are to disregard the testimony of Mr. Geoghegan as to Box 2 and 3, and the testimony of Trooper Smith as to Exhibit 2 and 3, because the State cannot, was not able to connect the contents of those two boxes with the defendant in any way. Now, that is a difficult thing to ask twelve people, who listened to long testimony concerning these boxes, who looked at them for a day and a half, and ask you to carefully separate in your own minds, to throw away this testimony. I ask you to do so too, in fairness to the defendant, and it is your legal duty to do so; it is your moral duty to do so. It is also your moral duty to forget why they were introduced, how they came to be introduced. Or why they were here at all."
The assistant prosecutor in his address to the jury explained:
"Now, ladies and gentlemen of the jury: Much has been said about S 2 and S 3, marked for Identification: When I stated the first day of the trial that I would connect up that testimony, those exhibits, with the defendant, I made that statement in good faith; an examination of the file indicated to me that I could do it. This morning the witness on whom I was depending for that purpose, could not identify the defendant as being connected with S 2 and S 3; I am sorry that S 2 and S 3 were ever brought into the case; they were brought into the case without any evil intent on my part, certainly *575 I don't care personally whether there is any conviction or not. It is one of those things that happens, and I want you to forget about it, about S 2 and S 3, and don't convict this defendant on account of S 2 and S 3, because it has nothing to do with the case; it shouldn't have been brought in."
The trial judge augmented the admonitory statements of both counsel by the deliverance to the jury of the following instruction:
"May I mention one thing right at the beginning of my charge, and that is in connection with the two cartons that were in the court room, and which the State could not definitely connect with this defendant. You will, of course, disregard the physical presence of them in the court room during part of the trial, or during the whole trial, as a matter of fact; or during the taking of the testimony, at least, and you will disregard testimony of any of the witnesses insofar as the evidence pertaining to those two cartons was concerned. You will disregard that entirely, and the Court will direct that that part be expunged from the record."
Nonetheless, counsel for the defendant insists that the prejudicial vice inherent in the continued presence of those exhibits before the eyes of the jurors and the attraction of attention to them in the interrogation of the State's witnesses was in reality ineradicable by the counteracting statements of counsel and the court's instruction. In an intelligently rationalistic manner he characterizes the notion that the human mind can discard graphic, vivid impressions at command as a myth born of judicial mental agility, and that if it were at all possible in the present case to cleanse the awareness of the exhibits from the minds of the jury, the premonitory expressions of counsel and court were ineffectual.
Such an assertion is seldom, if ever, demonstrable. The author of this opinion is reported to have once said that "The closing scene of the trial is played behind the curtain. * * * A general verdict is doubtless the merger of a variety of ideas, reflections and sentiments; a compound in which only the omniscient could identify the component parts and accurately ascribe to each its relative influence in generating the ultimate product. No one but the jurors can tell what was put into it and the jurors are not permitted to say." *576 Pulitzer v. Martin S. Ribsam & Sons Co., 19 N.J. Misc. 233, 234 (Cir. Ct. 1941). Vide, State v. Kociolek, 20 N.J. 92, 99 (1955).
In practice, where the verdict is manifestly discordant with the weight of the competent, relevant and credible evidence, the effectiveness of some improper influence may then be logically inferred; but where, after a thoughtful and deliberate review of the legally admissible evidence and the instructions of the court, it appears that the conclusion of the jury was legitimate and just, there is no justifiable occasion to conjecture and surmise that the jury's conclusion was reached upon the consideration of rejected evidence in disobedience of the instruction of the court.
Incidentally, we detect in the address of counsel for the defendant in criticism of the credibility of the testimony adduced by the State the statement: "You evaluate it. I respect your intelligence. I don't have to hammer you with a hatchet to drive it into your head." Whether the complimentary passage truly expressed counsel's estimate of the intellectual vigilance of the jurors or merely exemplified the enticing magnetism of an advocate's flattery is also in nubibus. There is no apparent reason, however, to infer that the jurors did not understand the concurrent statements of counsel and the instruction of the court with respect to the exclusion of the designated exhibits and the testimony relating thereto from their deliberations.
It is frankly conceded by counsel for the defendant that the determination of a motion for a mistrial exists within the orbit of the sound judicial discretion of the trial judge. State v. Vaszorich, 13 N.J. 99 (1953); State v. Witte, 13 N.J. 598 (1953).
But it has been said that the power to declare a mistrial should be employed "only in very extraordinary and striking circumstances." State v. Lewis, 83 N.J.L. 161 (Sup. Ct. 1912), affirmed 84 N.J.L. 417 (E. & A. 1913); State v. Unger, 93 N.J.L. 50 (Sup. Ct. 1919), reversed 94 N.J.L. 495 (E. & A. 1920); State v. Bleefield, 115 N.J.L. 76 (Sup. Ct. 1935), affirmed 115 N.J.L. 559 (E. & A. 1935); *577 State v. Steneck, 118 N.J.L. 268 (Sup. Ct. 1937), affirmed 120 N.J.L. 188 (E. & A. 1938); State v. Geiger, 129 N.J.L. 13 (Sup. Ct. 1942), affirmed 129 N.J.L. 518 (E. & A. 1943).
A jury trial is a human activity which in its just and efficient pursuit must have its practicalities. Improprieties, extraneous matters and legal errors will often infiltrate the proceedings. It would be exceedingly impracticable and impeditive if the occurrence of every such illegitimacy were to be deemed an imperative ground for a mistrial. Of equal certainty must be the consciousness that a defendant's apparent guilt must be subordinated in significance to his constitutional right to a fair trial.
There is therefore a marginal area in which the exercise of judicial discretion is feasible. The range, the degree, the magnitude of the prejudicial grievance must be graded and measured in relation to the effect thereof upon the substantial rights of the litigant. An appropriate inquiry is whether the wrong or error is so intrinsic in nature that it is inextinguishable by an explicit instruction from the court.
Again for serviceable reasons, errors and irregularities, where observed, should preferably be corrected at the trial rather than after it, and this may ordinarily be accomplished by an instruction of the court to the jury in definite terms upon the right of the matter. State v. Bolles, 13 N.J. Misc. 273 (Sup. Ct. 1935); State v. Vaszorich, supra.
In the circumstances of the present case we are of the opinion that the concordant and concomitant statements of both counsel for the defendant and for the State authoritatively confirmed, as they were, by the express instruction of the court adequately protected the substantial rights of the defendant from manifest wrong and injury. His opportunity to maintain his defense on the merits was not significantly abridged. R.R. 1:5-1; R.R. 2:5.
The judgment is affirmed.