77 N.J. Super. 328 (1962)
186 A.2d 499
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GEORGE DOYLE AND MONA DOYLE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1962.
Decided December 4, 1962.
*333 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Frank G. Schlosser argued the cause for appellants (Mr. Maurice M. Krivit, attorney).
Mr. William C. Brudnick, Assistant Prosecutor, argued the cause for respondent (Mr. Guy W. Calissi, Bergen County Prosecutor, attorney).
The opinion of the court was delivered by FOLEY, J.A.D.
Defendants appeal from a judgment of conviction of criminal abortion (N.J.S. 2A:87-1) entered on a jury verdict in the County Court. The indictment charged that on December 2, 1960 defendants "with intent to cause and procure the miscarriage" of Pauline Fealey unlawfully used "in and upon her divers instruments and means unknown."
The proofs offered by the State established that on the night of December 2, 1960, and for some time prior thereto, members of the Prosecutor's office assisted by officers of the Rutherford Police Department had the home of Doctor and Mrs. Doyle under surveillance. Shortly after midnight they saw Pauline Fealey and a companion, Rosemarie Intrieri, leave the residence and drive off in Mrs. Fealey's automobile. Mrs. Intrieri was the driver. Some of the prosecutor's detectives followed the Fealey car and after travelling a short distance, stopped it. At the request of the officers the women identified themselves. Mrs. Fealey gave a statement to the police to the effect that she had gone to Doctor Doyle for the purpose of being aborted and was then taken to the office of the county medical examiner by a policewoman in the group, where she was examined by Doctor Arthur W. Greenfield, assistant county physician.
*334 Meanwhile, Mrs. Intrieri had been taken back to the Doyle residence where, following a conversation with the officers, she rang the doorbell. When a young boy opened the door the police shoved Mrs. Intrieri aside and raided the Doyle's living quarters on the second floor. The police identified themselves and served a search warrant on Dr. Doyle. This occurred at 12:10 A.M.; by its terms the warrant had expired at midnight. In the course of an exhaustive search of the apartment they seized a number of items of surgical and medical equipment, as well as numerous other articles which might be of aid in the performance of an abortion. When the search was completed the Doyles were taken to the police headquarters and booked on the charge for which they were subsequently indicted.
At the trial Pauline Fealey testified that she became aware that she was pregnant when the cycle of her menstrual periods was disrupted, and she suffered from morning nausea. She had met Mona Doyle socially and knew her husband was a doctor. She called Mrs. Doyle and asked if the doctor could help her. She was told by Mrs. Doyle to call back in a week. When she did, an appointment was arranged for December 2, 1960. She agreed with Mrs. Doyle to pay a fee of $150.
She testified further that on the night of December 2 she and Mrs. Intrieri drove to the Doyle home. When they arrived Dr. Doyle was in the kitchen. Mrs. Fealey, Mrs. Intrieri and Mrs. Doyle went into the living room where three women relatives of the Doyles, and a young boy were watching television. Shortly, these persons left and Dr. Doyle joined Mrs. Fealey, Mrs. Intrieri and his wife in the living room. They continued to watch television, meanwhile having some highballs, prepared with whiskey which Mrs. Fealey had brought with her. During this time Dr. Doyle gave Mrs. Fealey a pill.
Shortly thereafter Mrs. Doyle told her to undress. She went to the bathroom, did so and then went to the kitchen. Upon the instructions of either Dr. Doyle or Mrs. Doyle she lay on the kitchen table which had been covered with a white *335 sheet. She was nude. Mrs. Intrieri stood at her right side, Mrs. Doyle at her left. They held up her legs and she was then so positioned that her vagina was at the edge of the table. Dr. Doyle stood directly in front of her and manually examined her internally. She was then given an anesthetic by Mrs. Doyle and lost consciousness.
When she was awakened she was in another room lying on a couch. She was then clothed in a white hospital gown and was covered by a blanket. A little later Mrs. Intrieri came into the room. Mrs. Fealey then noticed that she was flowing and that she was wearing a sanitary napkin which she had not brought with her. Aided by Mrs. Intrieri she went to the bathroom and dressed. They then joined the Doyles in the kitchen where they had coffee, crackers and cheese and cake. She noticed that the table upon which she had lain when the abortion was performed had been removed. There was a "general conversation" after which she was given a quantity of pills by Dr. Doyle to be taken every two hours; the doctor told her they were to prevent hemorrhage. The doctor and Mrs. Intrieri left the room, after which she gave Mrs. Doyle $150 in denominations of ten and twenty dollar bills. She and Mrs. Intrieri then left the apartment; Dr. Doyle accompanied them to the street holding her right arm.
It is clear from the testimony of Mrs. Intrieri that Mrs. Fealey was on the table for about 35 or 40 minutes during which time the doctor performed an operation on her private parts which resulted in a substantial extravasation of blood. Additionally, she corroborated Mrs. Fealey's account of happenings before and after the operation.
Dr. Greenfield testified that at the request of the prosecutor's office he examined Mrs. Fealey externally and vaginally at about 1:00 A.M. on December 3, 1960. The doctor concluded that Mrs. Fealey had been pregnant for about four or five weeks and that she had probably been aborted within a few hours of the time he examined her. The doctor also identified several of the objects which had been seized in the raid. He said of them that each served a legitimate medical *336 or surgical purpose, but that they could also be used in the performance of an abortion.
The defense contended through the testimony of Dr. and Mrs. Doyle, that Mrs. Fealey had come to the doctor only for the purpose of being fitted for a diaphragm and that upon discovering that Mrs. Fealey was flowing the doctor informed her that he could not examine her in that condition. They denied that he had performed any surgical operation upon Mrs. Fealey. Dr. Doyle said that if she had been recently aborted it was because of medication that she had administered to herself for that purpose.
Defendants now urge that the trial court erred in (1) denying defendants' motion for a judgment of acquittal, (2) denying defendants' motions for a mistrial, (3) in certain rulings on the admissibility of evidence and in the conduct of the trial, and (4) that illegal search and seizure was employed to procure evidence.
The test on a motion for judgment of acquittal is whether there is any legal evidence before the jury from which an inference of guilt can be legitimately drawn. State v. Rogers, 19 N.J. 218, 231-232 (1955); State v. Picciotti, 12 N.J. 205, 208-209 (1953); State v. Tassiello, 75 N.J. Super. 1, 4 (App. Div. 1962), certif. granted 38 N.J. 315 (1962). The evidence offered by the State, as outlined hereinabove, plainly brought the case within this controlling principle and, therefore, the motion for a judgment of acquittal was properly denied.
Defendants moved for a mistrial at four stages of the trial. The motions were denied. It is well settled that the direction of a mistrial in a criminal case rests in the sound discretion of the trial judge. It is to be exercised only in extraordinary and striking circumstances in order to prevent a failure of justice. State v. Steneck, 118 N.J.L. 268, 276 (Sup. Ct. 1937), affirmed 120 N.J.L. 188 (E. & A. 1938), cert. denied 305 U.S. 627, 59 S.Ct. 89, 83 L.Ed. 401 (1938). Judge Jayne in State v. Scala, 38 N.J. Super. 568, *337 577 (App. Div. 1956), commented upon the propriety of granting a mistrial:
"It would be exceedingly impracticable and impeditive if the occurrence of every such illegitimacy were to be deemed an imperative ground for a mistrial. Of equal certainty must be the consciousness that a defendant's apparent guilt must be subordinated in significance to his constitutional right to a fair trial.
There is therefore a marginal area in which the exercise of judicial discretion is feasible. The range, the degree, the magnitude of the prejudicial grievance must be graded and measured in relation to the effect thereof upon the substantial rights of the litigant. An appropriate inquiry is whether the wrong or error is so intrinsic in nature that it is inextinguishable by an explicit instruction from the court."
The propriety of the denial of the four motions will be assessed in light of these principles.
The first motion was directed to a question by the prosecutor inquiring what experience Dr. Doyle had had with abortions. After the motion was denied the doctor stated he had seen many cases during his internship and residency. We find no prejudicial error in the question and the answer to it was innocuous.
Next, the State inquired concerning a Mrs. Rubano who lived at the Doyles' home in the spring of 1961. The doctor had testified that Mrs. Rubano had accompanied Mrs. Fealey to the Doyle home on another occasion. Presumably for the purpose of affecting the doctor's credibility the prosecutor inquired of the particulars of Mrs. Rubano's living in the Doyle home. When the question was asked if Mr. Rubano was living with his wife, defense counsel moved for a mistrial. Although the questioning appears to have been irrelevant we do not find it was prejudicial to defendants.
The third motion for mistrial was directed to a question asked of Mrs. Doyle concerning a Mrs. Kim who, according to Mrs. Doyle, came to the Doyle residence to pick up a television set the Doyles were giving away. The prosecution asked if Mrs. Kim was pregnant and Mrs. Doyle replied that she did not know. The question appears to have been irrelevant *338 but in our judgment it was not of such a character as to necessitate a mistrial. Inquiry along this line was not pursued; thus the error, if any, can be characterized as harmless.
Lastly, on cross-examination of Sam Gringnola, a character witness called by defendants, the prosecution asked if he knew what "went on" in the Doyle residence on December 2, 1960. The objection to the question was sustained but the motion for mistrial was overruled. The only inference which could be drawn from the question was that something illegal or at least improper did "go on" in the Doyle home on December 2. Since the State had already introduced evidence from which it could be inferred that an abortion took place in the Doyle home on December 2, no prejudice was suffered by defendants as a result of the question.
Defendants also challenge the legal sufficiency of a hypothetical question asked of Dr. Greenfield concerning the use of the drug pitocin. Dr. Doyle had testified that he prescribed the use of pitocin in treatment of his sister-in-law Ruby Burns to relieve a "bearing down" pain in her uterus. To "rebut" this testimony Dr. Greenfield was called to the stand and presented a hypothetical question the effect of which was to establish that the use of pitocin was not indicated or required for the treatment of the complaint described. Defendants cite as error (1) the question was so unclear it could not be answered, (2) the answer was conjectural, (3) the use of actual names destroyed its hypothetical character, and (4) the answer usurped the function of the jury.
The opinions of experts must be based either upon facts within their own knowledge or upon a hypothetical question embracing facts supported by evidence and relating to the particular matter upon which the expert opinion is sought. Beam v. Kent, 3 N.J. 210 (1949). Since Dr. Greenfield had no personal knowledge of the facts, the form of the inquiry necessarily was hypothetical. The trial court ruled that the question had not been "garbled" but could be answered by *339 the expert. Examination of the question in the record indicates that it did become lengthy because of interruptions but that the meaning of the question did not become beclouded.
The objection that the answer was conjectural rests upon the assertion that certain facts were absent. Our courts have consistently held that a hypothetical question need not include all the facts, but may be limited to those the questioner may select to obtain the opinion of the witness on that basis. Ollert v. Ziebell, 96 N.J.L. 210, 213 (E. & A. 1921); Peer v. Newark, 71 N.J. Super. 12, 21 (App. Div. 1961), certif. denied 36 N.J. 300 (1962). See also Newman v. Zinn, 164 F.2d 558, 561 (3 Cir. 1947). The adversary may on cross-examination supply omitted facts and ask the expert if his opinion would be modified by them. McCormick on Evidence, § 14, p. 32 (1954). The trial judge offered defense counsel an opportunity to supply omitted facts. The offer was declined. While a party is under no obligation to supply such facts in order to perfect a hypothetical question propounded by his adversary, he cannot complain if he declines the opportunity to do so, provided, of course, that the question as framed contains a fair recitation of the relevant evidence. We find that the question met this test.
While, as a matter of common practice, it is advisable that a hypothetical question should be impersonal, since, in effect, it calls for an opinion as to the ultimate effect of assumed facts without regard to the testimonial origin of them, the use of actual names when necessary or helpful to a clear statement of the assumed facts does not, of itself, destroy the hypothetical nature of the question. Vide, Jackson v. Waller, 126 Conn. 294, 10 A.2d 763, 769 (Sup. Ct. Err. 1940). See also 2 Wharton's Criminal Evidence, § 950 (11th ed. 1935).
Finally, defendants urge that the answer given to the question usurped the jury's function. We disagree. The question called for a conclusion beyond the ken of the ordinary lay mind since it dealt with a subject peculiar to the special skill of a doctor. The jury was not compelled to *340 adopt the conclusion of the witness but was free to accept or reject the answer given by him in accordance with its judgment of his credibility. See City of Trenton v. John A. Roebling Sons Co., 24 N.J. Super. 213, 219 (App. Div. 1953).
While the relevancy of the question is doubtful, to say the least, we find no reason to conclude that variant medical opinions concerning the treatment of Ruby Burns in any way affected the jury's determination of defendants' guilt of the charge laid in the indictment.
Defendants challenge the admission in evidence of Dr. Doyle's medical bag, its contents, a carton containing medical supplies and the contents of a garbage pail, all seized by the detectives, as hereinabove noted. In addition to charging that these articles were the product of an unreasonable search and seizure in derogation of defendants' constitutional rights, a subject which we will presently discuss, defendants urge that the evidence was not supported by a sufficient proof foundation and, thus, it was irrelevant. There was persuasive proof that an abortion had been performed in the Doyle residence and the evidence was introduced by the State to link Dr. Doyle and his wife to the crime. The evidence was properly admitted; its weight was for the jury. In State v. Barnes, 75 N.J.L. 426, 429-430 (Sup. Ct. 1907), the court in a trial for abortion sanctioned the admission of bottles of ergot and knitting needles where testimony was received that these items may be used to produce a miscarriage. See also State v. Craig, 367 P.2d 617, 618 (Wash. Sup. Ct. 1961).
Defendants also question the admissibility of testimony given on rebuttal by Mrs. Kewoon Kim who testified that she was treated by Dr. Doyle at his home and paid him money for his services. Dr. Doyle on direct examination had testified that under the terms of his agreement with the Veterans Administration he could treat patients but could accept no remuneration. Thus, on cross-examination when he was asked about his treatment of Mrs. Kim, he denied ever medically treating her. Defendant properly points out that *341 testimony elicited on cross-examination can be contradicted only if germane to the issues of the case, as distinguished from collateral matters, citing State v. Hatch, 21 N.J. Super. 394, 399 (App. Div. 1952). However, defendants' assumption that Mrs. Kim's testimony was debarred by the rule enunciated in Hatch is without foundation. For reasons best known to himself, and presumably in support of some facet of his defense, the doctor testified that he was prohibited from charging for treatment at his home. If this issue was collateral, it was he who introduced it. The State was not bound to accept his testimony as true and had the right to cross-examine in relation to it to affect the declarant's credibility and thereafter to rebut his responses.
Defendants object to summation remarks by the prosecutor. It is settled that a prosecutor is limited to comments on the evidence in his summation but is not precluded from making a vigorous and forceful presentation of the State's case couched in trenchant terms. State v. Bucanis, 26 N.J. 45, 56 (1958), cert. denied 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958). Where the conduct crosses the line, the conviction will be reversed. State v. D'Ippolito, 19 N.J. 540, 550 (1955). Examination of the remarks of both counsel indicates that defense counsel in his summation inferentially attacked the integrity of the prosecution and the police department and that the prosecutor refuted the inferences in language which, when read in the context of defense counsel's remarks, did not overreach the bounds of propriety.
We come finally to defendants' contention that the search and seizure conducted by the authorities in the Doyles' residence on December 3, 1960 was unlawful and that under Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) the evidence thereby obtained, i.e., the various articles seized, should have been suppressed.
The State argues that defendants are without standing to attack the search because their attorney stipulated at the trial that no question was raised as to its legality. Such a statement was made, but the state of the law at the time *342 must be examined in considering its binding effect. The trial of the present case was commenced on June 6 and ended on June 29, 1961. Mapp, supra, was decided on June 19, 1961.
Prior to Mapp it was the settled law of this State that proof otherwise admissible would be received in evidence notwithstanding illegality of search and seizure. Eleuteri v. Richman, 26 N.J. 506, 509 (1958), cert. denied 358 U.S. 843, 79 S.Ct. 52, 3 L.Ed.2d 77 (1958). Thus, at the time the evidence in question was offered, any attempt of defendants to object to its admission would have been in vain. In an analogous situation our Supreme Court in State v. Smith, 37 N.J. 481, 489 (1962), noting that the defense was not chargeable with anticipating Mapp, determined the matter as if a proper objection had been made at the trial. We think that the reasoning of Smith has full application here.
However, we find it unnecessary to pass upon the sufficiency of the search warrant or the reasonableness of the search involved in this case. Assuming for the purposes of this appeal only, that the warrant was fatally deficient and that the search of the Doyles' premises was wholly unreasonable and so patently in contravention of their constitutional rights as to render the seized evidence inadmissible, the error in receiving it to be reversible must have been such as to have effected manifest wrong or injury to the defendants. See R.R. 1:5-1(a).
This is the rule laid down in the California case of People v. Tarantino, 45 Cal.2d 590, 290 P.2d 505 (1955). There, the court relied on Art. VI, Sec. 4 1/2 of the State Constitution, which provides substantially the same inhibition against setting aside a conviction for the improper admission of evidence as is contained in R.R. 1:5-1(a), supra. See also People v. Lujan, 141 Cal. App.2d 143, 296 P.2d 93 (1956); People v. Morgan, 146 Cal. App.2d 722, 304 P.2d 138 (1956); People v. Carter, 192 Cal. App.2d 648, 13 Cal. Rptr. 541 (1961). Significantly, the California courts have continued to follow State v. Tarantino, supra, since Mapp was decided. See People v. Terry, 57 Cal.2d 538, 21 Cal. Rptr. *343 185, 370 P.2d 985 (1962) and People v. McLaine, 22 Cal. Rptr. 72 (Cal. App., 1962). The concept that the illegally seized evidence must be prejudicial to the defendant in order to invalidate a conviction also appears to have been adopted in People v. Koenig, 34 Misc.2d 711, 228 N.Y.S.2d 1012 (1962); People v. Hill, 31 Misc.2d 985, 221 N.Y.S.2d 875 (1961). See Smallwood v. Commonwealth, 349 S.W.2d 830 (Ky. Ct. App. 1961). See also State v. Hunt, 280 S.W.2d 37 (1955) in which the Missouri Supreme Court while implying that a judgment must be reversed even though evidence independent of that illegally seized was sufficient to sustain a conviction, nevertheless labeled the disputed evidence prejudicial and thus applied the prejudicial-harmless error distinction.
Contra is the rule exemplified by Williams v. U.S., 105 U.S. App. D.C. 41, 263 F.2d 487 (1959), wherein the violation of the Fourth Amendment was held to require reversal even though the disputed evidence may have had "slight if any effect upon" the conviction. The underlying philosophy of the holding, as developed in the concurring opinion of Judge Danaher, is that the striking down of a conviction in a case where evidence either harmless or prejudicial has been unconstitutionally seized serves the paramount purpose of preventing illegal searches and seizures by the police in the future.
We do not find in Mapp v. Ohio, supra, resolution of these contending approaches. Nor did our own Supreme Court find occasion in discussing Mapp to indicate the effect upon a conviction of illegally seized, but not prejudicial, evidence. See State v. Smith, supra.
In our judgment the better reasoned approach is that presented by the cases cited herein which recognize that in ordinary circumstances the admission of evidence seized in violation of the Fourth Amendment will void a conviction only when it is reasonably inferable that such evidence was potentially prejudicial to the defendant, and tended to deprive him of a fair and impartial trial.
*344 So viewed, we conceive no logical reason for regarding the seized evidence as being of a stature sufficient to have influenced the result in this case. In the first place, neither the instruments nor the medicines seized were designed or prepared to effect or facilitate an abortion. This was clearly brought out in the cross-examination conducted by the defense. Furthermore, it is doubtful that the possession of these items by the doctor would, standing alone, suggest to the jury criminality on his part.
But more important is the fact that whatever significance the disputed evidence was deemed to have must have become of minuscule importance in the jury's thinking, in light of the testimony of Mrs. Fealey and Mrs. Intrieri. These witnesses graphically portrayed the commission of the crime charged. If they were believed, as undoubtedly they were, there was neither need nor reason for the jury to weigh the seized evidence, nor to consider its bearing upon defendants' guilt. Moreover, their testimony was unrelated to the seized evidence, and its probative force was in nowise dependent upon the challenged evidence for corroboration, and thus, we find no basis for concluding that this convincing testimony was tainted by evidence alleged to have been illegally seized. Compare the Massachusetts case of Commonwealth v. Spofford, 180 N.E.2d 673, 676 (Sup. Jud. Ct. 1962). At most the seized evidence was cumulative, hence its admission was not prejudicial. Cf. State v. Fahy, 183 A.2d 256 (Conn. Sup. Ct. Err., 1962).
Consequently, we are satisfied that even if the evidence was erroneously admitted (we do not pass upon this question), such error was harmless in the context of the entire proof.
A second facet of the argument defendants advance on this branch of the case is that Dr. Greenfield's testimony concerning his physical examination should have been excluded since its source was an unlawful search of Mrs. Fealey's person. The law is otherwise. The defendants were without standing to object to this evidence, since in order to qualify as a person aggrieved by an unlawful search or seizure *345 under the Fourth Amendment one must have been the victim of the search or seizure  one against whom the search was directed  as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).
The remaining ground relating to the court's criticism of defense counsel's conduct is devoid of merit.
Affirmed.