223 N.J. Super. 92 (1988)
538 A.2d 371
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
EDWARD F. FREEMAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 1987.
Decided February 17, 1988.
*95 Before Judges MICHELS, SHEBELL and GAYNOR.
John J. Haggerty, III, argued the cause for appellant (Gold and Haggerty, attorneys; Robert Francis Gold, of counsel and on the brief).
Carol M. Henderson, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General of New Jersey, attorney; Carol M. Henderson, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Following a lengthy jury trial, defendant Edward Freeman was convicted of murdering his wife, Sandra Varga Freeman (Sandy), by cyanide poisoning, a crime of the first degree, in violation of N.J.S.A. 2C:11-3. Defendant's motions for a new trial or, alternatively, a judgment of acquittal notwithstanding the verdict and for a post-trial examination of the jurors were denied. Defendant thereupon was committed to the custody of the Commissioner of the Department of Corrections for a term of life imprisonment with a 30-year period of parole ineligibility. *96 In addition, defendant was assessed a penalty of $1,000, payable to the Violent Crimes Compensation Board. He appeals.
According to the State's proofs, defendant worked in the post office where he was regularly employed as a mailman. His wife, Sandy, stayed at home with their three children. Although the couple had their share of domestic arguments, few people were aware that their marriage had greatly deteriorated. Prior to her death, Sandy complained that defendant worked too much, leaving her sitting home alone at night. In late 1983, defendant began staying out late two to three nights a week, claiming he was helping a man named George fix up a garage in Sayreville. In reality, defendant was having an extramarital affair with fellow postal employee Linda Amiano (Ms. Amiano), which began in June 1983 and continued up until the time of defendant's arrest. During the last 7-8 months of their marriage, the couple did not sleep together and Sandy began to suspect that defendant might be having an affair.
On Memorial Day, May 28, 1984, Sandy got up at approximately 9:30 a.m. and went to the bakery where she purchased bread and donuts. After breakfast, defendant's father, August "Gus" Freeman and mother, as well as defendant's brother Joe Freeman, stopped over for approximately one half hour as they were returning from the shore. Around noon time, defendant took his family to buy a car stereo, returning home at approximately 4:00 p.m. for dinner which Sandy had prepared. At approximately 6:00 p.m. the family went to visit some friends living in nearby Avenel, Andrew and Patricia Contala (Contalas). Since they had just eaten, the Freemans declined the Contalas' invitation to join them for dinner but remained and socialized for one to two hours. During the visit Sandy had a cup of coffee.
After leaving the Contalas, the Freemans stopped at a Carvel Store where Sandy purchased some ice cream. When they arrived home, Sandy bathed the children and put them to bed. *97 She then ate an ice cream sundae and the last cinnamon twist donut left from that morning's purchase. After consuming the ice cream and the donut, Sandy sat down in the T.V. room for several minutes before informing defendant that she was not feeling well. At this point, Sandy got up and climbed the stairs to the upper floor bathroom.
Several minutes later defendant followed Sandy up the stairs and heard a thud from the bathroom. After observing that Sandy had vomited and was lying unconscious next to the toilet, defendant telephoned his father (Gus) and told him to "come quick." Approximately five minutes later Gus Freeman arrived at his son's house. After Gus, an 18-year veteran of the Carteret First Aid Squad was unable to revive Sandy, he told defendant to call an ambulance. Gus knew that Sandy had been taking medication for high blood pressure and, therefore, concluded that she had suffered a stroke.
Officer Edward DeFelice (DeFelice) was assigned to dispatch duty at Carteret Police Headquarters (headquarters) at 10:30 p.m. on the night of May 28, 1984, when he received a call from defendant requesting an ambulance. Officer DeFelice dispatched Officer Barry Auker (Auker) to the Freeman residence and then alerted the local first aid squad and the Medic 10 paramedic unit at Rahway Hospital. Upon arriving at defendant's home, Officer Auker checked Sandy's vital signs and observed that she was breathing shallowly but had a somewhat strong pulse. Shortly thereafter, the first aid squad arrived and Auker assisted them in transporting the victim from the bathroom into the hall. By the time the Medic 10 unit arrived from Rahway Hospital, Sandy's pulse had stopped and efforts to revive her through CPR were ineffective.
The Medic 10 personnel set up an esophageal airway to pump Sandy's stomach. Vomiting was eventually induced and the paramedics cleaned up the area with several towels taken from defendant's bathroom. After attempting to resuscitate the victim for about an hour at home, the team placed Sandy in an *98 ambulance at approximately 11:30 p.m. and continued to administer CPR. Defendant accompanied Sandy in the ambulance back to Rahway Hospital, where she was pronounced dead at 11:41 p.m. on arrival at the Rahway Hospital Emergency Room.
In light of the rather natural, unsuspicious circumstances initially surrounding the victim's death, Officer Auker did not have photographs taken of the house or collect the towels used by the paramedics. Nevertheless, Officer Auker did complete a report of the incident, which was reviewed the next morning, May 29, 1984, by Detective Ronald Bennett (Bennett). Detective Bennett was prompted by this report to go to the autopsy conducted by the Medical Examiner, Dr. Marvin Shuster (Shuster), in the Perth Amboy Hospital Morgue later that morning.
During the course of the post-mortem examination, Dr. Shuster became convinced that the victim had not suffered a stroke or heart attack, but had in fact died from asphyxiation due to acute toxicity caused by cyanide. After detecting the odor of bitter almonds characteristically associated with cyanide, Dr. Shuster advised Detective Bennett of the potential public health hazard and asked him to secure any specimens at the scene of the death that might contain the poison. Dr. Shuster communicated his concern that foul play was a distinct possibility to Detective Bennett.
Detective Bennett thereafter dispatched Sergeant Michael Materazzo (Materazzo) and Detective Robert Talalai (Talalai) to the Freeman residence to collect any food or medication which Sandy might have ingested before she died. Upon their arrival, both defendant and Gus were advised that there was a possibility that Sandy had been poisoned, although the word cyanide was not mentioned, and defendant was asked to retrieve any food which she might have consumed. Defendant produced a paper bag containing donut remains, two Carvel ice cream containers, various medications, and a number of full garbage bags found outside of the house. Although defendant advised the officers that there was a rat problem in the neighborhood, *99 particularly in his backyard, to which the Board of Health was attending, he repeatedly denied that he had personally used any type of rat poison, weed killer or insecticide and that no such products were on the premises.
After meeting with Detective Ralph Spector (Spector) of the Middlesex County Prosecutor's Office later that morning, Detective Bennett telephoned defendant and asked him to come into headquarters to provide additional details regarding his wife's death. Defendant arrived at about 1:00 p.m., recounted the events of May 28, 1984 and left 25 minutes later. At this point, neither Detective Bennett nor Spector suspected that defendant was involved in his wife's death. That night, Detective Bennett received a toxicological report from Dr. Reng-Lang Lin (Lin) of the New Jersey State Medical Examiner's Office in Newark. This report revealed that samples taken from the victim's body had ten times the minimum lethal dose of cyanide. Dr. Lin found the cause of Sandy's death to be an acute cyanide overdose. Thereafter, Detectives Bennett and Spector met at headquarters at approximately 7:30 p.m. and made arrangements to visit the bakery and the Carvel and to interrogate the owners and any employees who had been working on Memorial Day. The detectives also visited defendant's home and requested that he return to the station to give a more detailed formal statement later that evening.
When defendant arrived at headquarters on the evening of May 29, 1984, the interview was conducted before Detectives Bennett and Spector and a police stenographer. Although defendant became visibly agitated and annoyed when told that he would be required to swear to the truth of the statement, he eventually calmed down and assented. In addition to the previous information defendant had provided, he now indicated, among other things, that Sandy had drunk "a glass of milk or glass of water or glass of something," just prior to becoming ill.
*100 As a precautionary measure, the bakery and Carvel were closed by the Board of Health until the source of cyanide could be positively identified. Initially, Detective Bennett believed he had located the source when it was revealed that Sandy had been cleaning their swimming pool the day before her death and that a particular pool chemical, No Clo, which defendant had purchased on that day, contained cyanoric acid. This theory, however, was disproved when the No Clo container and its contents tested negative for the presence of sodium cyanide.
On May 31, 1984, the investigation took a decisive turn. Ray Baumgartner, the owner of a local hardware store, appeared at headquarters with Ted Tarnowski (Tarnowski), an employee, who informed the police that defendant had advised him of his rat problem and had asked him at the beginning of May to get him something more "effective" than the standard commercial rodenticide. Tarnowski recounted that on May 22, 1984, he had obtained a quart jar of sodium cyanide through Keith Tuchalski, a friend who worked at a chemical plant, and had delivered it to defendant at his home. Having the benefit of this information, Detectives Bennett and Spector drove to the funeral parlor where Sandy's wake was being held and advised defendant's father and brother, William Freeman, that "[they] had some information on the type of poisoning but, ... needed some additional information from Edward" and requested that he come to headquarters after the wake.
Defendant arrived at headquarters with his brother William at 4:20 p.m. and was escorted into the Juvenile Aid Bureau, where Detective Spector immediately read him his rights from a Miranda warning card. After defendant verbally acknowledged that he understood his rights, he was handed the card to read and sign below the following statement:
I acknowledge I have been advised of and understood the Constitutional Rights on the reverse side of this card.
Although defendant expressly acknowledged an understanding of these rights, he became visibly upset over the card's reference to the words "accused or suspect" and refused *101 to sign the card. Spector told him he did not have to sign the card, and that they could simply indicate on the card that he had refused to sign. After defendant asked "What if I cross out the words accused or suspect?", the detectives replied "Edward, you can do whatever you want." Defendant then crossed out the words "accused or suspect" and signed the card. Defendant did not attempt to invoke any of his rights at this point and refused the assistance of an attorney four to five times over the course of the interrogation. Rather, when he was told by the detectives that:
[they] were going to talk to him about his wife's death. That [they] had some information and primarily [they] were going to ask him questions that [they] already had the answers to and what [they] wanted him to do was to tell the truth,
defendant agreed to answer any questions.
Initially, the questioning concerned whether defendant had recently obtained any pesticide or rodent killer. Defendant indicated that he had not purchased any rat poisons. However, when the fact was brought out that his wife's death certificate listed cyanide poisoning as the cause of death, defendant stated that he had tried to get some cyanide from Tarnowski, but that Tarnowski had never delivered it. Defendant then admitted that Tarnowski had in fact delivered "some poison" which he claimed he had gotten rid of because it was "too dangerous." Although defendant then asserted that he had thrown out the jar, he later claimed that he had accomplished this task by taking the jar into the kitchen and dumping the chemical in plastic bags which were then put inside of a brown paper bag and thrown into a dumpster located at nearby garden apartments. Defendant also claimed that he still had the glass jar which was now sitting on a shelf in his garage. Although Detective Bennett told defendant that he did not have to give them consent to obtain this item since a search warrant would inevitably be executed, defendant nevertheless gave the detectives permission to retrieve the jar from his garage.
*102 Detective Bennett immediately left headquarters, obtained the jar and checked the nearby dumpster for the bag of cyanide. Finding nothing, Detective Bennett returned to headquarters where he met Gus Freeman in the parking lot, and told him:
Gus, I'm sorry  but your son has been lying to me. He's got a very serious problem. I think you should get an attorney to help him.
The questioning of defendant then resumed until an attorney, Desmond Abazia, Esq., appeared approximately twenty-five minutes later and announced that he represented defendant. The interview concluded at that point.
Around 10 p.m. on May 31, 1984, defendant was arrested and charged with the murder of his wife. He was placed in the custody of the Middlesex County Prosecutor's Office in New Brunswick. Thereafter, Detective Spector, along with Assistant Prosecutor Kapsak, obtained a search warrant for defendant's home and three vehicles belonging to defendant in order to locate the missing cyanide. Although several items were seized from defendant's home when the warrants were executed in the early morning hours of June 1, 1984, none of the items contained cyanide or revealed any clues as to where the poison could be.
On June 12, 1984, Detective Spector received a call from Jerome J. Convery, Esq., counsel for defendant, regarding the discovery of an additional piece of evidence. At approximately 2:30 p.m. that day, Detectives Bennett and Spector met Convery and defense investigator Frederick Rast at headquarters and the parties then proceeded to defendant's residence, where a search of the garage and certain shelves in the garage was commenced. Detective Bennett opened and inspected a paint can bearing a blue label, which contained a substance identified through a subsequent laboratory analysis as sodium cyanide.
After a lengthy trial, defendant was convicted of the murder of his wife Sandy. This appeal followed.
*103 Defendant seeks a reversal of his conviction and a remand for a new trial on the following grounds set forth in his brief:
POINT I THE COURT BELOW ERRED IN FINDING A KNOWING, VOLUNTARY WAIVER OF MIRANDA RIGHTS BY DEFENDANT AND, AS SUCH, THE STATEMENTS MADE BY HIM AND THE ITEMS SEIZED AS A RESULT OF THOSE STATEMENTS SHOULD HAVE BEEN SUPPRESSED.
A. THE COURT BELOW ERRED IN FINDING A KNOWING, VOLUNTARY WAIVER OF HIS RIGHTS BY APPELLANT AND ADMISSION OF THE MAY 31, 1984 STATEMENT BY APPELLANT WAS ERROR.
B. THE COURT BELOW ERRED IN ADMITTING THE EVIDENCE SEIZED UNDER THE SEARCH WARRANT BECAUSE THE PROBABLE CAUSE FOR SAME WAS FOUNDED ON THE DEFENDANT'S STATEMENT OF MAY 31, 1984.
POINT II THE HEARSAY STATEMENTS OF SANDRA FREEMAN WERE INADMISSIBLE AND/OR IMPROPERLY USED, RESULTING IN REVERSIBLE ERROR.
POINT III THE ADMISSION OF THE TESTIMONY OF PATTIE CONTALA WAS PREJUDICIAL ERROR AND NECESSITATES REVERSAL OF THE CONVICTION BELOW.
A. THE OATH WAS NOT ADMINISTERED PRIOR TO THE TAKING OF THE DEPOSITION AND RULES 3:13-2, 4:14-3 AND 4:14-9 WERE NOT COMPLIED WITH.
B. THE WITNESS'S TESTIMONY AS TO THE DECEDENT'S SUICIDAL TENDENCIES WAS AN INADMISSIBLE OPINION.
C. THE TESTIMONY CONCERNING THE DEFENDANT'S "EXPLANATION" WAS UNDULY PREJUDICIAL.
POINT IV THE ADMISSION OF THE OPINION TESTIMONY OF DR. FREDERICK RIEDERS WAS REVERSIBLE ERROR AS SAME IS A NET OPINION.
POINT V THE VERDICT REACHED BY THE JURY BELOW WAS THE PRODUCT OF EXTRANEOUS INFLUENCES AND THE FAILURE TO GRANT A MISTRIAL ON ANY OF SEVERAL OPPORTUNITIES WAS REVERSIBLE ERROR.
A. THE JURY SHOULD HAVE BEEN REINSTRUCTED BEFORE CONTINUING ITS DELIBERATIONS AFTER DELIVERING ITS ABORTED VERDICT.
B. THE JURY VERDICT WAS TAINTED BY EXTRANEOUS INFLUENCES AND THE TRIAL COURTS FAILURE TO MAKE INQUIRY REQUIRES A NEW TRIAL.
C. THE JURY CONSIDERED THE DEFENDANT'S FAILURE TO TESTIFY, IN VIOLATION OF HIS FIFTH AMENDMENT RIGHTS AND THE TRIAL COURT'S SPECIFIC INSTRUCTIONS.

*104 POINT VI THE VERDICT RETURNED BELOW WAS AGAINST THE GREATER WEIGHT OF THE EVIDENCE AND THE DENIAL OF THE MOTION FOR A NEW TRIAL WAS ERROR.
POINT VII THE CUMULATIVE ERRORS BELOW NECESSITATE REVERSAL OF THE CONVICTION AND THE GRANTING OF A NEW TRIAL.

I.
Defendant first contends that the trial court erred in denying his motion to suppress the statements he made to the police while in Carteret Police Headquarters. He argues that he did not voluntarily and knowingly waive his Miranda rights since he was told to come to headquarters to receive information, not impart any. As such, defendant argues that he could not have entertained the notion that he was "signing away his constitutional rights" when he signed the waiver card, particularly since he had been "assured that he was not an accused or a suspect." Rather, defendant contends that since he signed the card because he thought that it would be the only way to learn how his wife died, any statements made by defendant in that interrogation and any information and evidence obtained as fruit thereof should have been suppressed as the product of an involuntary confession.
Although defendant may have developed a false sense of security when he was allowed to cross out the words "accused or suspect" from the waiver card, the statements made by him were done so knowingly, voluntarily and in compliance with the guidelines established in Miranda. The seminal case of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), established the following rules with respect to the waiver of rights in custodial interrogations:
Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he *105 wishes to consult with an attorney before speaking there can be no questioning. [Id. 384 U.S. at 444-445, 86 S.Ct. at 1612, 16 L.Ed.2d at 706-707].
* * * * * * * *
If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490, note 14, 12 L.Ed.2d 977, 986, 84 S.Ct. 1758 [1764]. This court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 82 L.Ed. 1461, 58 S.Ct. 1019, 146 ALR 357 (1938), and we re-assert these standards as applied to in-custody interrogation. [Miranda, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724].
See also State v. Fussell, 174 N.J. Super. 14, 19-20 (App.Div. 1980).
It is fundamental, however, that once Miranda warnings have been given, a subsequent statement is not rendered involuntary or unintelligent merely because the defendant's decision to speak is founded upon some ill-conceived notion of the law. In State v. McKnight, 52 N.J. 35 (1968), for example, defendant and several others were apprehended for robbing a gas station and abducting and killing the attendant on duty. After defendant was brought before a magistrate and advised of his Miranda rights, he stated, "I would like a lawyer present before I answer any questions," Id. at 41, at which point he was given copies of the murder and robbery complaints and placed in the county jail. At 9:00 a.m. the next morning, the defendant requested that a letter be delivered to the prosecutor advising him that he wanted to answer some questions. Although counsel had already been appointed for the defendant at about 4:15 p.m. that day, neither the defendant nor the Prosecutor's Office knew this when the defendant was taken to the court-house, re-advised of his Miranda rights, and interrogated from 4:30 to 8:30 p.m. After giving an oral confession and assisting the officers in the recovery of the gun, the defendant's statement was recorded stenographically, at which point the following colloquy between defendant and his interrogators ensued:
Question: After this has been transcribed you can read it. You will have an opportunity to read it.

*106 Answer: All right, sir.
Question: And if it is true and correct will you be willing to sign it?
Answer: Yes, sir.
DETECTIVE HERBERT: Time completed 
Answer: Before I sign it can my attorney read it? Before I sign it I would like for him to read it. O.K.?
Question: Yes, sir. [Id. at 46].
The statement was never signed. As such, the defendant argued that "the waiver was not `intelligently' made because he thought his word could not be used against him unless reduced to a writing signed by him." Ibid. In rejecting this argument, the Supreme Court reasoned that:
[t]he warnings were perfectly clear that anything he said could be used against him. It is absurd to suppose that a man who confessed and led the police to the murder weapon could have thought that none of that would matter if he declined to sign a statement embodying what he had said and done." [Id. at 46-47].
* * * * * * * *
Nowhere does Miranda suggest that the waiver of counsel at the detectional stage would not be "knowing" or "intelligent" if the suspect did not understand the law relating to the crime ... Hence, if a defendant was given the Miranda warnings, if the coercion of custodial interrogation was thus dissipated, his "waiver" was no less "voluntary" and "knowing" and "intelligent" because he misconceived the inculpatory thrust of the facts he admitted, or because he thought that what he said could not be used because it was only oral or because he had his fingers crossed, or because he could well have used a lawyer. [Id. at 54-55].
In State v. Graham, 59 N.J. 366 (1971), the defendant was arrested for shooting and killing his roommate. After defendant was taken into the custody of the Prosecutor's Office he was advised of his Miranda rights and asked whether he had an attorney. Although defendant responded that his attorney had advised him not to talk until he arrived the next day, he continued to volunteer remarks stressing that the shooting was an accident. These statements continued even after the detective advised him:
Q.... You want to rely on your attorney, that's positively all right with me.
A. Well 
Q. And we'll terminate this if you want. [Graham, 59 N.J. at 374].
*107 When the detective asked defendant whether he had been intimidated into relinquishing information, the defendant responded, "You have made me get it off my chest mister. That's what you have made me do. Thank you." Id. at 375. Ultimately, the Supreme Court held that the defendant had not been coerced into confessing since he "expressly acknowledged to the detective that he wanted to tell him about the shooting even though he had not been asked to discuss it ..." Ibid. Although defendant had never formally waived his Miranda rights in this case, the Supreme Court recognized that "[w]aiver need not take a designated legal form nor need it be expressed in designated legal terminology, State v. Yough, 49 N.J. 587, 596 (1967)" and that "`[a]ny clear manifestation of a desire to waive is sufficient.'" Graham, 59 N.J. at 376 citing State v. Kremens, 52 N.J. 303, 311 (1968).
Admittedly, "waiver requires not merely comprehension but relinquishment," Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424, 440 (1977), and that "in determining the question of waiver as a matter of federal constitutional law  ... it [is] incumbent upon the State to prove `an intentional relinquishment of a known right or privilege.'" Brewer, 430 U.S. at 404, 97 S.Ct. at 1242, 51 L.Ed.2d at 439 citing Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 ALR 357 (1938). Moreover, the State's burden of proving that the statement was voluntary must be beyond reasonable doubt. State v. Miller, 76 N.J. 392, 404-405 (1978); State v. Kelly, 61 N.J. 283, 294 (1972). Here, the State has met this burden of proof. Defendant was fully advised of his Miranda rights and asked if he would like the presence of an attorney four to five times during the course of the interrogation. At the time of this investigation defendant was a 34-year old high school graduate working full time with the United States Postal Service. Thus, viewed under the "totality of the circumstances" test referred to in Miller, 76 N.J. at 402, defendant was of sufficient intelligence to have known that he was waiving his constitutional right to remain silent when he signed the Miranda rights card and began talking, even if he *108 was allowed to cross out the words "accused or suspect." At no time was defendant told that he was not the target or suspect of their investigation, nor would the officers be required to tell him even if he were the target. See State v. Hollander, 201 N.J. Super. 453, 483 (App.Div. 1985) certif. den. 101 N.J. 335 (1985). As in State v. McKnight, defendant should have known after being advised of his constitutional rights that anything he said could be used against him. Despite defendant's misconception of "the inculpatory thrust of the facts he admitted" Id. 52 N.J. at 55, there exist no grounds for finding that the waiver was not made voluntarily, knowingly, or intelligently.
Furthermore, State v. McCloskey, 90 N.J. 18 (1982), State v. Dickens, 192 N.J. Super. 290 (App.Div. 1983), certif. den. 97 N.J. 697 (1984) and State v. Fussell, supra, are distinguishable and do not require a contrary result. Unlike the situation in McCloskey, Dickens or Fussell, defendant agreed to talk without the presence of an attorney and refused assistance of counsel four times until Detective Bennett advised defendant's father that such assistance should be obtained. Thus, under the circumstances, there is no merit to defendant's claim that all evidence and information obtained from defendant's statement were `fruits of the poisonous tree.' Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
Consequently, the trial court properly denied defendant's suppression motion.

II.
Defendant also contends that the testimony of certain witnesses regarding conversations they had with the victim should not have been admitted under Evid.R. 63(12). Particularly, defendant contends that the introduction of statements made by the victim to her mother, Anna Fuller, her sister Judith Ann Miller, and Andrew Contala were improperly admitted *109 to prove a motive on his part rather than to show the victim's state of mind at the time the statements were made.
Regarding defendant's health in the Fall of 1983, Anna Fuller, decedent's mother, testified that her daughter had told her "that she was very worried about [defendant], he was losing a lot of time from work and he was sick and just plain worried ... She was just afraid that something would happen and she would be left without him." Fuller also testified that prior to her death the victim "had mentioned that for about eight months there was no sex life" between the couple. With respect to February 1984, when the couple was experiencing considerable marital difficulties, Fuller related that "when they would have an argument she'd say to me that she didn't know what she was going to do."
Decedent's sister, Judith Ann Miller, who was apparently very close to her, testified that "toward the end when we spoke on the phone when Eddie was going out a lot I had even suggested to her that maybe he was seeing somebody and she seemed to refuse it for awhile there and then she had even talked about maybe he should have been followed, but she didn't know how to go about it"; that Sandy expressed fears to her about Eddie committing suicide: "She didn't want anybody to talk to him about his health or ask him anything other than how he felt" and that "Sandy had called me one day when he had gone to the doctor in the afternoon and she told me that he was diagnosed as a manic-depressant"; that "before she died she told me they hadn't slept together one time in the last seven or eight months"; that Sandy had indicated to her that when Eddie started working nights in Sayreville, "she was sitting by herself alone at night and she didn't like it"; that "Sandy used to tell me of arguments," "Sandy used to complain about not having enough money alot of the time to buy the kids things," and that a year prior to her death Sandy had told her that since defendant would punch holes in the wall during these arguments, she kicked a hole in the wall as well. Finally, defendant refers to testimony of Andrew Contala, regarding his conversation *110 with the decedent, that "She complained a little bit because [defendant] was not working all the time."
We are satisfied that these hearsay statements should not have been admitted in evidence under Evid.R. 63(12). In our view, the victim's hearsay statements were not probative of anything more than the marital breakdown which she and defendant experienced. Moreover, with respect to the reference to defendant's diagnosis as a manic depressive, which goes directly to his mental or physical condition, it is apparent that the trial court found such testimony questionable enough to warrant a limiting instruction to the jury. However, although the hearsay statements were not properly admissible, we do not find that they were so prejudicial as to constitute reversible error. The circumstantial evidence of defendant's guilt was so strong that the testimony complained of was not necessary to establish guilt nor was there any real possibility that "the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971); See also State v. Bankston, 63 N.J. 263, 273 (1973); State v. Melvin, 65 N.J. 1, 18-19 (1974). Stated simply, the error was harmless.

III.
Defendant challenges as reversible error the admission into evidence of the videotaped testimony of Patti Contala. Ms. Contala, a close friend of the victim and a witness for the State, suffers from a condition known as agoraphobia, which is the fear of open places. On May 3, 1985, a hearing took place outside the presence of the jury to determine whether a videotaped deposition of Ms. Contala taken the day before at the Middlesex County Police Academy in Edison, New Jersey would be admitted as evidence. After reviewing several medical affidavits regarding Ms. Contala's condition, the trial court ruled that she was an unavailable witness pursuant to R. 3:13-2 and ordered, over defendant's objection, that the jury be able to view the videotaped deposition of Ms. Contala. Before reviewing *111 the tape, the trial court was advised that the witness had not been placed under oath prior to being deposed. In order to correct this situation, the State offered to have Ms. Contala sign an affidavit certifying that her testimony during the deposition was the truth, as opposed to redoing the entire videotape. Although this alternative solution was accepted by both the trial court and defendant, defendant now contends that it constituted reversible error based on non-compliance with R. 3:13-2, R. 4:14-3 and R. 4:14-9.
R. 3:13-2(a), in pertinent part, provides that "[i]f it appears to the judge of the court in which a complaint, indictment or accusation is pending that a material witness is likely to be unable to testify at trial because of death or physical or mental incapacity, the court ... may order that a deposition of the testimony of such witness be taken ..." Subsection (b) of R. 3:13-2 adds that "[t]he deposition shall be videotaped" and "taken before the judge at such location as will be convenient to all parties ..."
With respect to such depositions, R. 4:14-3(b) requires that:
[t]he officer before whom the deposition is to be taken shall put the witness on oath and shall personally, or by some one acting under his direction and in his presence, record the testimony of the witness. The testimony shall be recorded and transcribed on a typewriter unless the parties agree otherwise.
Finally, R. 4:14-9 which relates specifically to videotaped depositions, provides in subsections (c) and (d) as follows:
(c) Transcript. The videotaping of a deposition shall not be deemed to except it from the general requirement of stenographic recording and typewritten transcript. Prior to the swearing of the witness by the officer, the videotape operator shall state his name, address and firm on the record.
(d) Filing, Sealing, Copies. Immediately following the conclusion of the videotaped deposition, the videotape operator shall deliver the tape to the officer who shall take physical custody thereof for the purpose of arranging for the making of one copy thereof. Upon return to the officer of the original and copy of the tape, the officer shall seal and file the original with the clerk of the county in which the matter is pending and shall deliver the copy to the party taking the deposition. That party shall then furnish a copy of the tape to an adverse party who shall make it available for copying and inspection to all other parties.
*112 Evidently, in addition to the State's failure to have Ms. Contala sworn prior to taking her deposition, the deposition was not stenographically transcribed until January 9, 1985, the identity of the videotape operator is unknown, no reporter or officer was present at the time of the deposition nor was the tape sealed and filed in accordance with R. 4:14-9(d). Nevertheless, although the State demonstrated a considerable lack of preparation in failing to abide by these rules, such violations do not constitute reversible error.
Preliminarily, it should be noted that defendant expressly consented to the use of a subsequent certification. As such, our courts have consistently held that "[t]rial errors acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. Richardson, 208 N.J. Super. 399, 407 (App.Div. 1986), certif. den. 105 N.J. 552 (1986); State v. Simon, 79 N.J. 191, 205 (1979); State v. Pontery, 19 N.J. 457, 471 (1955); State v. Harper, 128 N.J. Super. 270, 277 (App.Div. 1974), certif. den. 65 N.J. 574 (1974).
Beyond this, considering the merits of defendant's claim, it is perfectly clear that a reversal of defendant's conviction is not required. Evid.R. 18 provides, in part, that "A witness before testifying shall be required to take an oath or make an affirmation or declaration to tell the truth under the penalty provided by the law ..." (Emphasis added). In the Comment to this rule however, the authors note that "[o]ne acceptable manner of obtaining the commitment of a witness to tell the truth is to certify in lieu of taking an oath, pursuant to R. 1:4-4(b)", which provides as follows:
(b) Certification in Lieu of Oath. In lieu of the affidavit, oath or verification required by these rules, the affiant may submit the following certification which shall be dated and immediately precede his signature: "I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment." [Emphasis added].
Thus, the procedure established under R. 1:4-4(b) stands as an alternative to the general requirement that "all prospective witnesses ... must be sworn or affirmed prior to the giving of *113 testimony." State in Interest of R.R., 79 N.J. 97, 108 (1979) (Emphasis added); State v. Gambutti, 36 N.J. Super. 219, 223-234 (App.Div. 1955); State v. Walton, 72 N.J. Super. 527, 535 (Law Div. 1962).
The use of certification in lieu of oath was directly addressed in State v. Parmigiani, 65 N.J. 154 (1974). In Parmigiani, the defendant, a used car salesman, was sued for selling a repossessed car which he represented was a demonstration model. Defendant was thereafter served interrogatories which required him to state the car's odometer reading at the time it was repossessed and whether the odometer had been changed. Defendant answered that the car had a mileage reading of 1,911 which had not been altered prior to being sold, and certified that said answers were true pursuant to R. 1:4-4(b). After a Grand Jury found that defendant had answered these questions falsely, an indictment was returned charging him with willful false swearing in violation of N.J.S.A. 2A:131-4.
The issue before the Supreme Court was whether the defendant could be convicted of perjury notwithstanding the fact that he did not take an oath before a person authorized to administer oaths. In rejecting defendant's contention that one who violates R. 1:4-4(b) cannot be subject to prosecution under the false swearing statute, the Supreme Court stated that:
[t]he clear purpose of the broadened language [of R. 1:4-4(b)] was to subject those who made wilfully false certifications to the punishment available under any applicable law or legal principle and to so advise the signatory. The Court's allowance of certification in lieu of oath was admittedly intended as a convenience but it in nowise reduced the solemnity of the verification or declaration of truth. Indeed the language of the certification was well designed to impress the signatory with the gravity and consequence of his act, perhaps much more so than the sometimes perfunctory notarization.
* * * * * * * *
If [defendant's] contention were accepted it would narrow the statutory language [of N.J.S.A.] 2A:131-4] and would impair the statutory goal. It would in effect render the statute inapplicable, not only to those who may certify in lieu of oath under R. 1:4-4(b), but also to those who may testify on the witness stand without oath but with "affirmation or declaration to tell the truth under *114 the penalty provided by the law." Evid.R. 18; 1972 Edition New Jersey Rules of Evidence, pp. 59, 63. [Parmigiani, 65 N.J. at 156-157].
In light of Parmigiani, the same considerations support the legitimacy of a certification in lieu of oath used to verify testimony which was inadvertently not given under oath. Although the use of it in this instant case was admittedly a convenient way to avoid redoing the entire videotaped proceeding, Ms. Contala was nevertheless under the same solemn obligation to tell the truth and was subject to the same sanctions as if she had been sworn in prior to testifying.
Finally, with respect to the State's failure to have the deposition transcribed contemporaneously, to have the identity of the video operator placed on the record, or to have the tape properly sealed and copied, all pursuant to R. 4:14-9, it appears that R. 4:16-4 is controlling. R. 4:16-4(c)(2) provides as follows:
(2) Objections Waived. Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties, and errors of any kind which might be obviated, removed, or cured if promptly presented are waived unless timely objection thereto is made at the taking of the deposition.
Additionally, subsection (d) provides:
(d) As to Completion and Return of Deposition. Errors and irregularities in the manner in which the testimony is transcribed or the deposition is prepared, signed, certified, sealed, endorsed, transmitted, filed, or otherwise dealt with by the officer are waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained. [R. 4:16-4(c)(2) and (d)].
Although defendant's counsel objected to the use of the tape at trial, this objection was premised upon "the admissibility of a video tape as opposed to live testimony" and not upon technical irregularities. As such, the objections to the aforementioned errors were waived pursuant to R. 4:16-4.

IV.
Defendant also challenges the admissibility of Dr. Frederick Rieders' testimony on the ground that it was an inadmissible "net opinion." Dr. Rieders, a forensic toxicologist who testified for the State, opined that the victim did not take *115 cyanide in a powder form because she did not display the characteristic burn marks around the lips and mouth. Based on the extremely high concentration of cyanide found in the victim's stomach, however, the doctor indicated that she must have ingested it orally in some form. When asked about the type of foods which could have potentially contained the cyanide, Dr. Rieders testified that a cyanide-sprinkled donut "would have a miserable taste. It would burn ... and ordinarily, I would expect them to spit it out. If they swallowed it and died from it, I'd expect burns on the lips and burns on the mouth," and that the use of ice cream to camouflage the poison would be "possible but ... not very likely" because of the difficulty in getting it into solution form. The doctor concluded that "the most likely way is to dissolve it in something, in some water substance or liquid substance." Although a mixture in plain water would taste a little soapy and probably burn, the doctor believed that soda, milk and tea with sugar and lemon would be very effective in camouflaging the taste of cyanide. In response to a hypothetical question, Dr. Rieders concluded that the victim had consumed an amount of cyanide "in excess of a gram to be roughly at the spoonful, a good spoonful" and had expired 10-15 minutes later.
Defendant contends that reversible error was committed because the doctor's testimony critically failed to account for "the quantity of tea, milk, soda or water necessary to dilute or cover the taste and burning effect of cyanide." As such, defendant maintains that omission of this "vital link" reduces the doctor's testimony to no more than "net opinion." We disagree.
In Polyard v. Terry, 160 N.J. Super. 497 (App.Div. 1978) aff'd 79 N.J. 547 (1979), we reiterated the well-established principle that:
it is "within the special function of a jury to decide if the facts on which the answer of an expert is based actually exists, and the value or the weight of the testimony of the expert is dependent upon and no stronger than the facts on which it is predicated." [Id. 160 N.J. Super. at 511 citing Mohr v. B.F. *116 Goodrich Tire Co., 147 N.J. Super. 279, 284 (App.Div. 1977), certif. den. 74 N.J. 281 (1977)]; Panko v. Grimes, 40 N.J. Super. 588, 596 (App.Div. 1956).
Medical expert testimony "must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible." Johnesee v. Stop & Shop Cos., Inc., 174 N.J. Super. 426, 431 (App.Div. 1980). However, such testimony is not inadmissible merely because it fails to account for some particular condition or fact which the adversary considers relevant. The adversary may on cross-examination supply the omitted conditions or facts and then ask the expert if his opinion would be changed or modified by them. See State v. Doyle, 77 N.J. Super. 328, 339 (App.Div. 1962) aff'd 42 N.J. 334 (1964). Thus, even assuming that the quantity of the food or liquid through which the cyanide was ingested was relevant, this would have been an appropriate matter to ask the expert about on cross-examination. The absence of this fact, however, does not reduce Dr. Rieders' testimony to an inadmissible net opinion, since the doctor gave sufficient reasons to logically support his opinion.
The evidence established that an excessive amount of cyanide had been ingested by the victim, that there were no burn marks around the victim's mouth and lips and that the victim had consumed certain foods and a beverage prior to her death. Based on these proofs, Dr. Rieders concluded that since the foods which Sandy had consumed would not effectively conceal a caustic poison such as cyanide, the cyanide was likely camouflaged by mixing it into a beverage. As such, Dr. Rieders' expert opinion as to the probable means of causing Sandy's death was properly admitted into evidence.

V.
Defendant also claims that the jury verdict was tainted by extraneous influences and that therefore the trial court's failure to grant his motion for a post-verdict interrogation requires a new trial.

*117 A.
The first instance involved a betting pool among the jurors as to the time and date that a verdict would be returned. Stephen Kulyk (Kulyk), who was selected along with 14 other jurors to hear the Freeman case, was excused from jury service during the third week of trial because of business commitments. At this time Kulyk did not advise the trial court of any improprieties or misconduct concerning the jurors. On May 29, 1985, however, approximately one week after the jury returned the guilty verdict against defendant, the trial court was informed by defendant's trial counsel that he had just received a call from Kulyk, indicating that the jurors had not followed the trial court's instructions. At the trial court's request, Kulyk submitted a letter which, in pertinent part, related the following information:
After the first week of the trial all of us agreed to establish a betting "pool" to determine the time and date of the verdict. Each of us gave $1 and wrote our name and answer on a piece of paper that was provided and collected by a juror by the name of Mike. The juror selecting the closest time and date to the actual verdict would be the winner and keep all the money. The pool was done as a fun thing to do and no harm was intended.
As the trial proceeded slowly a number of jurors were getting nervous and anxious for a conclusion. The slow pace and various delays caused some of us to be concerned. In fact as time passed by many of us would "tease" each other concerning who was still alive and eligible to win the pool.
Based on this information, defendant made application for a post-verdict interrogation of the jury or, in the alternative, for a new trial. After reviewing this letter, the trial court stated for the record that:
The initial question is whether Juror Kulyk should be called back and examined by the court. I am satisfied that the procedure that I have used in this case of requiring the juror to advise the court of any allegations he wished to make in detail sufficed in determining whether or not there were allegations which require further or required further investigation.
With particular respect to the betting pool, the trial court noted that "[h]ad this come to the court's attention prior to the end of the very lengthy trial, the court would have admonished the jury and stopped the pool." However, the trial court did not find a new trial necessary, stating:

*118 I have greater faith in the jurors of this country and in this county to think that their verdict would be in any way influenced by adjusting the length of their deliberations in order to possibly win the lofty sum of 14 or 15 dollars. The betting pool although unwise does not in any way connect with the guilt determining process of the defendant by the jury. The application for new trial on this basis or to further interview Kulyk or any other juror is denied.
The pertinent rules which control this issue are Evid.R. 41 and R. 1:16-1. Evid.R. 41 provides as follows:
Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined.
In a similar vein, R. 1:16-1 provides that:
Except by leave of court granted upon good cause shown, no attorney or party shall himself or through any investigator or other person acting for him interview, examine or question any grand or petit juror with respect to any matter relating to the case.
These rules reflect the priority which our courts have given to preserving the secrecy of jury deliberations and to insulating the jury's decision-making processes from outside scrutiny. State v. LaFera, 42 N.J. 97, 106-108 (1964). This is necessary because "`[f]reedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.'" La Fera, 42 N.J. at 106 citing Clark v. United States, 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993, 999 (1932). It is evident, however, that the public interest in protecting the sanctity of the jury room must be balanced by the criminal defendant's right to trial by an impartial jury pursuant to the Sixth Amendment of the United States Constitution and Article I, par. 10 of the New Jersey Constitution. State v. Williams, 93 N.J. 39, 60 (1983). As Justice Handler reiterated in Williams:
It has long been recognized under the federal constitution that a defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself. Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907) (Holmes, J.).

*119 The courts in this State have recognized that under the State Constitution, Art. I, par. 10, the right of a defendant to be tried by an impartial jury is of exceptional significance. We have stressed repeatedly that the triers of fact must be "as nearly impartial `as the lot of humanity will admit.'" State v. Singletary, 80 N.J. 55, 62 (1970) (quoting State v. Jackson, 43 N.J. 148, 158 (1964), cert. den. sub nom. Ravenell v. New Jersey, 379 U.S. 982, 85 S. Ct. 690, 13 L.Ed.2d 572 (1965)); id., 80 N.J. at 70 (Clifford, J., dissenting); id. at 74 (Handler, J., dissenting); [Williams, 93 N.J. at 60].
With particular respect to juror misconduct which is discovered after a verdict has been entered, the case of Panko v. Flintkote Co., 7 N.J. 55 (1951), is instructive. There, the Supreme Court stated:
It is well settled that the test for determining whether a new trial will be granted because of the misconduct of jurors or the intrusion of irregular influences is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so. The stringency of this rule is grounded upon the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices. [Id. at 61-62 (Emphasis added)].
Here, of course, the jurors' betting on the anticipated time and date of the verdict was wrong and certainly cannot be condoned. However, as noted in State v. Athorn, 46 N.J. 247, 250 (1966), cert. den. 384 U.S. 962, 86 S.Ct. 1589, 16 L.Ed.2d 674 (1966), "[c]alling back jurors for interrogation after they have been discharged is an extraordinary procedure which should be invoked only upon a strong showing that a litigant may have been harmed by jury misconduct." The trial judge acknowledged that the betting pool was unwise and noted that he would have stopped it had he learned of it during the trial. Nonetheless, he concluded that it was most unlikely that the jury's verdict "would be in any way influenced by adjusting the length of their deliberations in order to possibly win the lofty sum of 14 or 15 dollars." We agree that there is nothing in the record which suggests that the betting pool influenced or had a tendency to influence the jury to reach a verdict it might not *120 otherwise have reached. Moreover, we are convinced that the incident did not prejudice defendant's right to a fair trial.
Consequently, we hold that in the circumstances, the trial court did not mistakenly exercise its discretion by refusing to recall the jury and interrogate them concerning the betting pool incident.

B.
We are satisfied also that the trial court properly refused to recall the jury and interrogate them based on a letter sent to the trial court by Mrs. Margaret Ebert, a woman who knew defendant and the decedent personally. Defendant's argument is premised upon that portion of Mrs. Ebert's letter recounting a conversation she had with a juror, George Knezevich, shortly after the conclusion of the trial, which read:
He (Knezevich) left me with the distinct feeling that the jury didn't find Eddie guilty because he didn't testify but rather they couldn't find Eddie innocent because he didn't testify for himself. George said "It's something like that."
As such, defendant claims that the jury impermissibly considered his failure to testify in violation of his Sixth Amendment right.
This claim is clearly without merit. First, in accordance with Evid.R. 41, this letter should not be considered because it was offered "to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him to assent to or dissent from the verdict ..." See also State v. Athorn, supra, 46 N.J. at 251, (holding that "our courts ... have generally refused to accept from jurors, for the purpose of impeaching a verdict, any evidence of the discussion they may have had among themselves while considering their verdict.")
Secondly, since the statements referred to above are at best hearsay, they would clearly not provide good cause for post-verdict interrogation of jurors. In State v. Hall, 87 N.J. Super. 480 (App.Div. 1965), defendant was tried and convicted of seduction. On post-verdict motion for interrogation of two jurors, defendant produced an affidavit of an attorney who had overheard *121 the jurors in a diner subsequent to the verdict state that the jury had failed to deliberate, with all but two immediately arriving at the conclusion that defendant was guilty. Citing LaFera, we agreed with the trial judge that good cause was not shown to warrant interrogation. Hall, 87 N.J. Super. at 484. See also People v. Manson, 132 Cal. Rptr. 265, 335-336, 61 Cal. App.3d 102, 216 (1976) cert. den. 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977) (holding that "statements attributed to trial jurors by others are no more than hearsay or double hearsay and are thus incompetent and insufficient to either impeach a jury verdict or to compel a court to conduct a post-verdict voir dire of the jury.") Moreover, in the instant case, it is not so much a hearsay statement of a juror that is being offered for its truth, but rather an incompetent opinion of a non-juror, Mrs. Ebert, accompanied by the juror Knezevich's cryptic response, "It's something like that."
Finally, it is apparent that although there is no case law directly on point on this issue in New Jersey, the courts in a number of other jurisdictions have refused to overturn verdicts based on testimony that the jury considered defendant's failure to testify in deliberations. See for example, People v. Graham, 678 P.2d 1043, 1048 (Colo. App. 1983) cert. den. 467 U.S. 1216, 104 S.Ct. 2660, 81 L.Ed.2d 366 (1984); State v. Covington, 136 Ariz. 393, 666 P.2d 493 (App. 1983); People v. Bennett, 90 Ill. App.3d 64, 45 Ill.Dec. 419, 412 N.E.2d 1001, 1008 (1980); Nacol v. State, 590 S.W.2d 481, 486 (Tex.Cr.App. 1979); State v. Callahan, 119 Ariz. 217, 580 P.2d 355, 358 (App. 1978); State v. Kaufman, 221 Iowa 492, 265 N.W.2d 610, 619 (Iowa 1978).

VI.
We are thoroughly convinced from our study of the record that contrary to defendant's claims, there was sufficient evidence in the record as a whole from which the jury could find defendant guilty beyond a reasonable doubt of murdering his wife in violation of N.J.S.A. 2C:11-3. In our view, the jury *122 verdict was not a miscarriage of justice under the law. R. 2:10-1. See State v. Carter, 91 N.J. 86, 96 (1982); State v. Sims, 65 N.J. 359, 373-374 (1974).

VII.
Finally, we are satisfied that all of the other contentions and the arguments advanced by defendant in support of them are clearly without merit. R. 2:11-3(e)(2).
Accordingly, the judgment under review is affirmed.