826 A.2d 773

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
DOMINICK DE FRANK, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted May 21, 2003—Decided July 3, 2003.

Before Judges KING, WECKER and FUENTES.

*Antonio J. Toto,* attorney for appellant.

*Bruce J. Kaplan*, Middlesex County Prosecutor, attorney (*Simon Louis Rosenbach*, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, J.A.D.

Defendant, Dominick DeFrank, appeals his conviction for driving under the influence of alcohol (DWI), *N.J.S.A.* 39:4–50. Defendant was first tried and convicted in South Brunswick Municipal Court. He was again convicted in a trial *de novo* in the Law Division. *R.* 3:23–8. Defendant was assessed the mandatory fines and penalties and his driving privileges were revoked for a period of two years.

Defendant argues that the trial court erred in admitting into evidence a certification signed by the nurse who drew his blood for alcohol content (BAC) analysis at the time of his arrest. We disagree and affirm.

## I

The salient facts are not in dispute. Defendant was involved in a motor vehicle accident on Route 535 in South Brunswick when the car he was driving struck a telephone pole. Although he was traveling southbound, he struck a pole located on the northbound lane of Route 535. The force of the impact drove the pole halfway into the car's engine compartment.

South Brunswick Police Officer Donald Whicker was dispatched to the scene the accident. Upon arriving, he observed defendant standing outside his car, claiming that he had fallen asleep at the wheel. Defendant spoke slowly, slurring his words. He had an odor of alcoholic beverage on his breath, watery, bloodshot eyes, and droopy eyelids. He also staggered as he walked and had difficulty producing his driving credentials. At this point, defendant was arrested for DWI and transported, via ambulance, to Robert Wood Johnson University Hospital where Ricardo Carr-

era, a registered nurse employed by the Hospital, drew a sample of his blood for analysis. The result of this test revealed defendant's BAC level to be .158. The result of the laboratory analysis of defendant's blood conducted by the State Police reflecting a BAC level of .158 was admitted into evidence without objection from defense counsel.

At trial, the State moved into evidence, pursuant to *N.J.S.A.* 2A:62A–11, the certification signed by Carrera attesting that he was the nurse who obtained a sample of defendant's blood at the request of Officer Whicker. In the interest of clarity, we have reproduced the certification in its entirety. The format of the certification contains a number of fill-in-the-blank areas. These areas are highlighted here in bold.

### CERTIFICATION FOR BODILY SPECIMENS TAKEN IN A MEDICALLY ACCEPTABLE MANNER PURSUANT TO *N.J.S.* 2A:62A–10 and *N.J.S.* 2A:62A–11

I, Ricardo Carrera RN/(name) employed as a

physician/nurse/medical technician/(cross out inapplicable titles) by: RWJUH,_____/(name of employing hospital or medical center) having been requested on 12–19–01/(date) by P.O.D. Whicker # 359–South Brunswick/(name, title and employer) pursuant to *N.J.S.* 2A:62A–10, to withdraw or otherwise obtain certain bodily specimens from the person of Dominic DeFrank,/(name of subject) to wit:

Alcohol/Blood Samples,/(specimens requested) and to deliver such bodily specimens to a law enforcement officer, do hereby certify, pursuant to *N.J.S.* 2A:62A–11, that on 12–19–01/(date) at *0130* o'clock AM/PM I withdrew or otherwise obtained the aforesaid bodily specimens pursuant to the provisions of *N.J.S.* 2A:62A–10 from the person of Dominic DeFrank/(name of subject) in a medically acceptable manner and I delivered all such bodily specimens to P.O. D. Whicker # 359%,/(name) South Brunswick/(title & employer) *Police Dept.*, a law enforcement officer.

I further certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*SIGNATURE OF RICARDO CARRERA*

At trial, the State clarified the process as to how Whicker obtained the signed certification from Nurse Carrera.

Q. Let me ask you some questions about that. How is that process accomplished, when you place somebody under arrest and you would like to have drug—

blood drawn from them at the hospital, is there a particular procedure that South Brunswick uses and that they've trained you to do?

A. Yes, there is. What we would do is we would contact either a registered nurse or phlebotomist, someone who is trained in taking blood samples. What we do is we have a blood kit that we actually give; it's sealed kit, we give it to the individual who is going to be taking the blood. And, then we actually watch the process from entire—from the start to finish, up until the point that I receive the blood, and bring it back and place it in the evidence refrigerator.

Q. You say that there is a blood kit, is that—what is that exactly?

A. What it is is like a small cardboard box, a little bit bigger than the size of a tape deck, and what it has in it, it's [a] plastic holder. There's two blood vials, each with a gray top to it, and then there is a needle, a—like a separate swab for cleaning the skin, and then there is a separate holder to actually put the container in.

Q. Okay. And, it's your testimony that you provide the contents of that blood kit to [whoever] asked the—to draw blood from a particular defendant?

A. Yes, we do.

Q. And, is that what you did in this case, with this defendant, that night?

A. Yes, I did.

Q. Okay. I'm going to show you what's been marked S–1 for identification. And, now it has Robert Wood Johnson University Hospital letterhead—or the stamp on the top of it, so I know that you of course, didn't prepare this form, and I assume it's not part of the blood kit?

A. No, sir, it's not.

Q. Can you tell the Court what that is, S–1 for identification?

A. Yeah. This is a form used by the hospital, and what this is is it's the individual who actually draws the blood, it states that I'm requesting him to draw blood for my purposes.

Q. Okay. And, what was the individual's name?

A. The individual was Ricardo Carrerra (phonetic), registered nurse.

Q. Does it say that on the form?

A. It's actually—has his signature, and—

DEFENSE ATTORNEY: Objection, Judge, as to who's signature that is.

THE COURT: The—what's the basis of your knowledge of the signature?

A. Sir, the basis of my knowledge of the signature was I actually watched the nurse, Ricardo Carrerra, sign the form.

THE COURT: How did you know who it was when he signed it, I mean did he [have] identification on or—

A. Yeah. Yes, sir. He had—what Robert Wood Johnson Medical Center has their staff wear is a name tag and it has a picture of the individual, their name, and

their title. That individual who signed that form, and I observed him signing—

DEFENSE ATTORNEY: Objection, Judge, that's hearsay. He's reading off, you know, what it says on the nurse's card.

THE COURT: He's telling me what he personally observed as identification on a medical personnel in a hospital.

DEFENSE COUNSEL: I'll withdraw, Judge.

THE COURT: And, it is for my inquiry. I'm really trying to make a decision about your first objection, [addressing defense counsel]. So, you observed him with that identification and he signed S-1 in your presence?

A. Yes, sir.

THE COURT: The same name as you observed on his identification badge?

A. Yes, sir, he did.

THE COURT: Okay. So, I'm going to overrule the objection as to how Officer Whicker knew the identification of the person signing this—the—signing S-1. You can proceed, Mr. Solomon.

## II

Defendant argues that the certificate should not have been admitted into evidence because Carrerra's signature was not notarized by a notary public as required by *N.J.S.A.* 2A:62-11. We will be guided in our analysis by a bedrock principle of statutory construction articulated by Chief Justice Weintraub almost half a century ago:

It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design. It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end "words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms."

[*New Capitol Bar & Grill Corp. v. Div. of Employment Sec.*, 25 *N.J.* 155, 160, 135 *A.*2d 465 (1957).]

The facts here present a classic opportunity to reaffirm the inherent wisdom of this approach.

### *N.J.S.A.* 2A:62A–11 provides that:

Any person taking a specimen pursuant to [*N.J.S.A.* 2A:62A–10] shall, upon request, furnish to any law enforcement agency a certificate stating that the specimen was taken pursuant to section 1 of this act and in a medically acceptable

manner. The certificate shall be signed under oath before a notary public or other person empowered to take oaths and shall be admissible in any proceeding as evidence of the statements contained therein.

This statute is part of the Good Samaritan Act, *N.J.S.A.* 2A:62A–1 to 15. We must read it in *pari materia* with *N.J.S.A.* 2A:62A–10a, which states:

When acting in response to a request of a law enforcement officer, any physician, nurse or medical technician who withdraws or otherwise obtains, in a medically accepted manner, a specimen of breath, blood, urine or other bodily substance and delivers it to a law enforcement officer, shall be immune from civil or criminal liability for so acting, provided the skill and care exercised is that ordinarily required and exercised by others in the profession.

The Statement of the Senate Law, Public Safety and Defense Committee attached to the Bill states that the statute's purpose is to "encourage medical personnel to cooperate with law enforcement officials in obtaining these [blood and other body fluids] samples." Senate Law, Public Safety and Defense Committee, s. to S. 1089 (enacted as L.1986, c. 189). Although not expressed in the history of the Act, we think it reasonable that *N.J.S.A.* 2A:62A–11 was also adopted, at least in part, in response to the difficulties experienced by municipal prosecutors in securing the appearance of medical personnel at DWI trials and the concomitant strain these court appearances placed upon the affected medical professionals.

A notary public is a public officer whose function it is to attest and certify by his or her hand and official seal, certain classes of documents in order to give them credit and authenticity. *Commercial Union Ins. Co., v. Burt Thomas–Aitken Construction Co.,* 49 *N.J.* 389, 393, 230 *A.2d* 498 (1967); *In re Estate of Gerhardt,* 336 *N.J.Super.* 157, 161, 763 *A.2d* 1289 (Ch.Div.2000). Thus, it is reasonable to infer that the statutory requirement that the medical professional signing the certificate do so "under oath before a notary public or other person empowered to take oaths" is designed to approximate the type of solemnity ordinarily associated with judicial proceedings. *N.J.S.A.* 2A:62A–11.

However, the oath administered to witnesses in court proceedings under *N.J.R.E.* 603 does not require meticulous adherence to

a particular format. The principal purpose of requiring witnesses to swear or affirm is to remind them of their obligation to tell the truth under penalty of law. *State v. Caraballo,* 330 *N.J.Super.* 545, 554–55, 750 *A.*2d 177 (App.Div.2000). In fact, a witness is permitted to certify to tell the truth pursuant to *R.* 1:4–4(b) in lieu of taking an oath. *State v. Freeman,* 223 *N.J.Super.* 92, 112, 538 *A.*2d 371 (App.Div.1988), *certif. denied,* 114 *N.J.* 525, 555 *A.*2d 637 (1989).

The certificate signed by the nurse who drew defendant's blood contained a certification which met all of the requirements of *R.* 1:4–4(b). The fact that this certification was not signed in the presence of a notary public does not in any way diminish the legal obligation of its signatory to tell the truth nor prevent the criminal prosecution of those who make false statements therein. *State v. Parmigiani,* 65 *N.J.* 154, 156–57, 320 *A.*2d 161 (1974). In this context, the underlying purpose for the procedural requirements in *N.J.S.A.* 2A:62A–11 was satisfied. The certificate was properly admitted as evidence that defendant's blood was drawn by a medical professional, in a medically acceptable manner.

Affirmed.