**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2475-22
                        A-2529-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BASHIR PEARSON,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHARLES E. LEACH, a/k/a
TYSHAWN LITTLE, CHARLES
LITTLE, and CHARLE LEACH,

     Defendant-Appellant.

_____

Argued March 10, 2025 – Decided April 29, 2025

Before Judges Sabatino, Gummer, and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 21-02-0031 and 21-02-0032.

Colin Sheehan, Assistant Deputy Public Defender, argued the cause for appellant Bashir Pearson (Jennifer N. Sellitti, Public Defender, attorney; Colin Sheehan, of counsel and on the brief).

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant Charles E. Leach (Jennifer N. Sellitti, Public Defender, attorney; Stephen W. Kirsch, of counsel and on the brief).

Milton S. Leibowitz, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Milton S. Leibowitz, of counsel and on the briefs).

PER CURIAM

In these related appeals argued back-to-back,[1] codefendants Charles Leach (A-2529-22) and his nephew Bashir Pearson (A-2475-22) appeal their respective convictions of murder and other offenses at a January 2023 jury trial. Defendants raise several overlapping arguments, as well as a few points specific to their individual cases. We affirm.

I.

---

[1] We consolidate the appeals for purposes of this opinion.

According to the State's proofs, Leach and Pearson participated in shooting and killing the victim, Tyshun Kearney, at about 7:00 p.m. on January 22, 2020, on the sidewalk outside of a barbershop in Elizabeth. No eyewitnesses to the shooting testified.

Two police officers, who happened to be in a patrol car stopped at a traffic light one block away, responded immediately to the scene. They chased one of the suspects. Shortly thereafter, the police apprehended Leach in a nearby parking lot.

Leach's DNA was found on one of the guns used in the shooting, which had been hidden in a trash can outside of Pearson's residence. Pearson's DNA was found on a black mask allegedly used in the crime and later discarded on the curbside of Pearson's residence.

The State presented surveillance video footage of defendants' movements in the area before and after the shooting. In addition, the State presented testimony from a cell tower data expert, who opined that several calls had been placed between defendants' cell phones around the time of the murder using cell towers located near the crime scene.

Defendants, who did not testify at trial, contend they had been misidentified as the culprits. The jury found them guilty of all counts of the

3

indictment.  In a second phase of the trial, Leach was convicted of a "certain persons" weapons possession offense, N.J.S.A. 2C:39-7(b)(1).

The trial court imposed on Leach a sentence of sixty years for the murder conviction, subject to the parole disqualifier mandated under the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2.  The court also imposed a concurrent ten-year sentence on the certain-persons offense.  The court sentenced Pearson to a thirty-five-year prison term, also subject to NERA.

II.

On appeal, Leach argues the trial court:  (1) should have excluded the State's cell tower expert under the "net opinion" prohibition and recent case law; (2) should have excluded lay opinion from an investigating police detective explaining why he gave chase at the scene; (3) erred in telling the jury the court had admitted, over objection, the State's compilation of reenactment photos; (4) failed to hold a sufficient trial on the "certain persons" weapons possession count; and (5) imposed on Leach an excessive aggregate sentence of sixty years.

More specifically, Leach argues the following points in his brief:

POINT I

WHEN AN EXPERT WITNESS OFFERS NO LEGITIMATE BASIS FOR A CONCLUSION THAT

A PARTICULAR CELL-PHONE TOWER HAS A PARTICULAR RANGE, THE SUPREME COURT OPINION IN STATE V. BURNEY UNEQUIVOCALLY BARS THAT EXPERT FROM TESTIFYING THAT CELL-PHONE CALLS USED PARTICULAR CELL TOWERS IF THE PURPOSE OF THAT TESTIMONY IS TO SHOW THE LOCATION OF THE PHONE BEING USED AT THE TIME. BECAUSE SUCH TESTIMONY WAS ADMITTED HERE OVER OBJECTION AND COULD HAVE INFLUENCED THE VERDICTS, THE CONVICTIONS SHOULD BE REVERSED.

POINT II

A DETECTIVE IMPROPERLY OFFERED LAY OPINION OVER OBJECTION THAT HE BELIEVED DEFENDANT TO BE ACTING SUSPICIOUSLY IN FLEEING AN ACTIVE SHOOTING SCENE AS HE DID AND THAT THE DETECTIVE FEARED, AS A RESULT, THAT DEFENDANT WAS AN ARMED SUSPECT.

POINT III

THE JUDGE IMPROPERLY IMPINGED UPON THE JURY'S FACTFINDING ROLE WHEN HE SUA SPONTE INFORMED THE JURORS THAT, OUTSIDE OF THE PRESENCE OF THE JURY, THE DEFENSE HAD OBJECTED TO THE ADMISSION OF THE PHOTOGRAPHIC REENACTMENT OF CERTAIN SURVEILLANCE VIDEO, BUT THAT THE JUDGE "HAS DETERMINED THAT IT IS PROPERLY ADMISSIBLE" AND "APPROPRIATE FOR THE JURY TO VIEW" THAT EVIDENCE. (NOT RAISED BELOW).

5

POINT IV

THE RECORD APPEARS TO CONTAIN NO
FINDING OF GUILT ON THE CHARGE OF
SECOND-DEGREE POSSESSION OF A WEAPON
BY "CERTAIN PERSONS." A TRIAL WAS NOT
HELD ON THAT COUNT AND THE TRANSCRIPTS
CONTAIN NO GUILTY PLEA TO THAT CHARGE.
(NOT RAISED BELOW).

POINT V

THE SENTENCE IMPOSED IS MANIFESTLY
EXCESSIVE.

Pearson joins in Leach's arguments regarding the cell tower data expert

and the court's comment to the jury about the reenactment photos. Pearson

further argues the court erred in charging the jury that his flight from New Jersey

to South Carolina after the shooting, as well as his use of a false name when he

was detained in South Carolina, could be considered as proof of a consciousness

of his guilt. Pearson does not appeal his thirty-five-year aggregate sentence.

In particular, Pearson argues:

POINT I

THE TRIAL COURT DEPRIVED PEARSON OF A
FAIR TRIAL BY ALLOWING THE CELL TOWER
EXPERT TO OFFER INADMISSIBLE NET
OPINION, WITH NO LEGITIMATE BASIS OTHER
THAN HIS OWN GENERAL EXPERIENCE AND
TRAINING, THAT A PARTICULAR CELL TOWER
HAD A PARTICULAR RANGE AND, THEREFORE,

6

THAT PEARSON'S CELL PHONE WAS NEAR THE SHOOTING.

POINT II

THE TRIAL COURT ERRED IN CHARGING THE JURY ON FLIGHT BECAUSE PEARSON'S PRESENCE IN SOUTH CAROLINA DID NOT REASONABLY JUSTIFY AN INFERENCE THAT HE LEFT NEW JERSEY WITH A CONSCIOUSNESS OF GUILT AND TO AVOID ARREST.

POINT III

THE TRIAL COURT IMPROPERLY ENCROACHED ON THE JURY'S FACTFINDING ROLE BY SUA SPONTE INSTRUCTING THE JURORS THAT, OUTSIDE OF THEIR PRESENCE, IT OVERRULED DEFENSE COUNSEL'S OBJECTION AND FOUND THE REENACTMENT PHOTOGRAPHS "PROPERLY ADMISSIBLE" AND "APPROPRIATE FOR THE JURY TO VIEW." (NOT RAISED BELOW).

Having applied the pertinent scope of appellate review for each of these issues, we conclude they lack sufficient merit to warrant a new trial. We examine them, seriatim, in the discussion that follows.

A.

Admission of the State's Cell Tower Expert

During the State's case-in-chief, it elicited testimony from a cellular telephone records analysis expert, Detective Sergeant Nicholas Falcicchio of the

7

Union County Prosecutor's Office. Falcicchio is trained in the forensic use of cell phone tower analysis and had previously testified in other cases as an expert on that subject. Defendants have not contested Falcicchio's credentials to testify as an expert.

Falcicchio analyzed four cell phone numbers used during the night of the murder. The cell phone numbers were linked to cell phones belonging to Leach, Pearson, and two other individuals associated with them: Marquis Little and Mayasha Scott.

Falcicchio's testimony was accompanied by a slideshow displaying the use and activity of each cell phone and the tower that each phone had used to place those calls that evening. The data showed the calls placed between and among these four numbers and the time stamps for each call.

Falcicchio explained that the call data produced by the cell phone providers identified the physical location of cell phone towers used by the cell phone. The closest tower was three blocks from the murder scene.[2]

Falcicchio made it clear to the jury that the specific location of the individual cell phones was not ascertainable based on the data. In addition, the

---

[2] Counsel represented to us at oral argument that the nearest cell tower was approximately three-quarters of a mile from the shooting location.

graphics presented on the slideshow did not indicate radio frequency coverage of the towers.

Both defendants objected to the admission of Falcicchio's testimony. The trial court overruled their general objections and permitted the expert to offer various opinions about the cell phone usage. However, as we will detail, the court sustained objections as to certain specific questions posed to the expert.

Leach argues that various portions of Falcicchio's expert testimony constituted improper "net opinion" and are inadmissible under the Supreme Court's decision in State v. Burney, 255 N.J. 1 (2023), which was issued after this trial. Specifically, he contends Falcicchio's testimony asserting that the cell phones belonging to Leach, Pearson, and Little were "'in the general area' of the crime scene based upon the location of the cell site" amounted to an impermissible net opinion. Pearson joins in that argument for exclusion, as he did in the trial court.

The thrust of defendants' argument is derived from the Court's directives contained in Burney, 255 N.J. at 1, which overruled aspects of this court's decision in State v. Burney, 471 N.J. Super. 297 (App. Div. 2022). Defendants contend the Supreme Court's opinion in Burney disallows the admission of

Falcicchio's testimony. They characterize his testimony as reliant on his personal experience and nothing more.

To evaluate these net opinion arguments, we first detail the pertinent testimony and the associated evidentiary rulings made by the trial court. The record shows the court addressed, and in some instances, sustained several objections aimed at limiting Falcicchio's explanation of cell tower use and data.

Initially, defense counsel objected to Falcicchio's use of the term "general area." The court acknowledged that the State in its questions should avoid the use of vague terms such as "vicinity, general area, neighborhood, [and] possible location." The court sustained that initial objection and made the following observation:

> [I]t was my understanding that the testimony [the State] intended to present was that the cell phones were hitting off of a tower <u>in a particular direction</u> up to a range of not to exceed [a certain distance]. <u>Not in a general area of the tower</u>. There is a range from which typically there are exceptions, I believe, that it will switch to another tower at a certain distance.
>
> [(Emphasis added).]

Indeed, defense counsel conceded that the testimony should reveal the nexus of "the phone to the tower, not the phone to the area. That's clear from the actual science."

The prosecutor asked the expert, "[i]s there generally a range of coverage that this tower be accepting calls from phones two miles away . . . three miles away, or is there a general range?"  Defense counsel objected again, which was overruled by the court.  Falcicchio responded, "[i]t depends upon how that particular tower is configured."

Further questioning of Falcicchio on direct examination generated the following exchange:

> Q:  If you could explain that further.
>
> A:  If that tower is configured to cover that distance, which would not be typical in an urban environment, that could be possible.
>
> Q:  What does that mean, to not be typical in an urban environment.
>
> A:  So typically in an urban environment where there's a need for a large amount of cell sites, there are large quantity of cell sites that cover a smaller distance.  In an area that might not be as densely populated, cell sites might cover further distances in miles.
>
> Q:  And, obviously, is this a rural or urban area that's being displayed on this side?
>
> A:  This is an urban area.
>
> Q:  Given that, what does slide 9 demonstrate with regard to these particular phone numbers and those towers between the hours of 6:44 and 7:04?

A-2475-22

A: It depicts usage at that . . . those two particular sectors on those cell [sites].

Defense counsel objected again, and the court again overruled.

Falcicchio eventually concluded that the data presented indicated the cell phones were in the "general area" of the cell towers that were used to make the calls, which he clarified to mean the following: "Should a device have been in the area of the location depicted by the dot, it would have presented records that look similar to this."

On appeal, defendants assert the trial court erred in allowing Falcicchio to testify that cell phone calls were made in the "general area" of the shooting, arguing that particular conclusion violated the prohibition on net opinions expressed by the Court in <u>Burney</u> and other case law.[3] They further contend the error was sufficiently prejudicial to require their guilty verdicts to be set aside.

In evaluating these evidentiary arguments, we are guided by well-settled principles. We generally defer to the evidentiary rulings of a trial court unless

---

[3] Although the slides with superimposed maps used by the expert are provided in the appendices, defendants do not argue on appeal that the slides themselves violated the net opinion doctrine. Indeed, we note that the lead slide, Exhibit S-2, contains a prominent disclaimer that the "Shaded area displays direction of sector and does not estimate coverage area." The next slide, S-3, likewise cautions that "[t]he shaded area **_DOES NOT_** depict the actual RF coverage area or footprint." (Bold face type, capitalization, and italics in the original).

an appellant demonstrates an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021) (noting that an appellate court "will not substitute [its] judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'") (quoting State v. Medina, 242 N.J. 397, 412 (2020)). Under that deferential standard, appellate courts "review a trial court's evidentiary ruling only for a 'clear error in judgment.'" Medina, 242 N.J. at 412 (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

N.J.R.E. 702 and N.J.R.E. 703 govern the admissibility of expert testimony. N.J.R.E. 702 specifies the requisite foundation for expert testimony: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." To be admissible under this rule,

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;
>
> (2) the subject of the testimony must be at a state of the art such that an expert's testimony could be sufficiently reliable; and
>
> (3) the witness must have sufficient expertise to explain the intended testimony.

13

[State v. Harvey, 151 N.J. 117, 169 (1997); see also Creanga v. Jardal, 185 N.J. 345, 355 (2005).]

N.J.R.E. 703, meanwhile, provides that

[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

At the time of this trial, the Court still applied in criminal cases the admissibility test of Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), which required that an expert's methodology be "generally accepted." In 2023, the Court revised the approach in New Jersey criminal and quasi-criminal cases to adopt the multi-factor test set forth by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993). State v. Olenowski, 253 N.J. 133 (2023). Here, the parties do not dispute under either Frye or Daubert the admissibility of the general methodology for cell tower data analysis that was used by the State's expert. Instead, their arguments for exclusion center solely on the net opinion doctrine.

"The net opinion rule, a corollary of N.J.R.E. 703, 'forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Burney, 255 N.J. at 23 (quoting Townsend v. Pierre,

14

221 N.J. 36, 53-54 (2015)); see also Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011).  "The rule requires that an expert 'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Townsend, 221 N.J. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).  As the Court instructed in Townsend:

> The net opinion rule is not a standard of perfection.  The rule does not mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable.  An expert's proposed testimony should not be excluded merely "'because it fails to account for some particular condition or fact which the adversary considers relevant.'"  Creanga, 185 N.J. at 360 (quoting State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1998)).  The expert's failure "to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion."  Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002) (citing Freeman, 223 N.J. Super. at 115-16)).  Such omissions may be "a proper 'subject of exploration and cross-examination at a trial.'"  Ibid. (quoting Rubanick v. Witco Chem. Corp., 242 N.J. Super. 36, 55 (App. Div. 1990)); see also Harvey, 151 N.J. at 277 ("'[A]n expert witness is always subject to searching cross-examination as to the basis of his opinion.'" (quoting State v. Martini, 131 N.J. 176, 264 (1993))).
>
> [221 N.J. at 54-55 (citations reformatted).]

The alleged net opinion offered here by the State's expert involved the analysis of cell phone data.  Our Supreme Court has favorably noted that

15

"[h]istorical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time." Burney, 255 N.J. at 21 (quoting United States v. Hill, 818 F.3d 289, 295 (7th Cir. 2016)). Unlike GPS, "cell site analysis simply confirms that the phone was somewhere within the coverage radius of the cell tower during the recorded activity." Id. at 22. "Across the nation, state and federal courts have accepted expert testimony about cell site analysis for the purpose of placing a cell phone within a 'general area' at a particular time." Id. at 21-22 (emphasis added).

In Burney, an FBI agent serving as an expert for the State testified that cell towers in the area in question "had an approximate coverage range with a radius of about one mile" and "[t]hat estimated radius was based solely on [the special agent's] 'rule of thumb' for the area—a 'good approximation' based on his training and experience." Id. at 5. The agent "relied on that approximation to place defendant's cell phone at or near the crime scene at the time of the robbery" that the defendant was accused of committing. Ibid.

The Supreme Court in Burney concluded the agent's testimony was "an improper net opinion" "because the testimony was based on nothing more than [the agent's] personal experience . . . ." Id. at 25. The Court observed that the agent had not substantiated that his one-mile-radius approximation of the cell

16

tower range "is common practice in cell tower analysis, or that his one mile 'rule of thumb' had been used by any other agent or radio frequency engineer." Id. at 24. The Court further noted the agent "did not review the height of the [pertinent tower], did not review its rated power, did not calculate the estimated absorption of radio energy by nearby buildings or hills, did not review the specific angle of the tower's antenna, and did not review any diagnostic data from the tower" or "perform any tests of the [tower's] area of signal coverage." Id. at 24-25. However, the Court emphasized that it did not suggest that, "to be admissible, expert testimony must consider all of the factors listed above." Id. at 25.

At its core, Burney clarified that "our 'net opinion' doctrine under New Jersey evidence law weeds out experts who base their opinions on purely personal standards or 'rules of thumb.'" State v. Olenowski, 255 N.J. 529, 586 n.28 (2023). But the State's expert in this case did not attest to any personal "rules of thumb." He did not quantify the distance between any of the cell phones and the tower. Nor did he quantify the tower's range with a specific number. When asked by counsel whether a range of "two or three miles" pertained, Falcicchio responded it was "possible," but it depended it on how a tower was configured. He stated that in an urban area (such as the one in this

17

case) "there are [a] large quantity of cell sites that cover a smaller distance," but he was not asked to and did not quantify that distance.

Moreover, unlike the State's expert in Burney, Falcicchio acknowledged to the jury the "potential flaws" of the cell data analysis. He stressed that "we don't know the exact location of the [phone's] handset," and he explained that the science "simply says that the cell location is a graphic for me. It depicts the direction of the antenna's orientation. It doesn't estimate any RF [radio frequency] coverage." At most, the expert tied the cell phones to the "general area" of the tower nearest the crime scene, which contrasts with the specific one-mile radius touted by the expert in Burney, based upon his personal "rule of thumb."

In sum, the context here is markedly distinguishable from that in Burney. No violation of the net opinion doctrine occurred.

Even if we assume, for the sake of argument, the State's cell data expert overstepped the net opinion line, defendants have failed to establish harmful error flowing from that alleged misstep. The prosecutor did not refer to Falcicchio in his summation, nor did he quote from or allude to any of the expert's testimony. With respect to the cell phone evidence, the prosecutor stated only that "[t]he phone calls all match up perfectly with all of the video

18

evidence," an assertion that simply tied the undisputed times of the phone calls with the events occurring outside the barbershop. By contrast, in <u>Burney</u>, the prosecutor told the jury in closing argument that the State's cell phone expert was "the most credible" witness in the case. 255 N.J. at 30.

Furthermore, as the State has catalogued in its appellant arguments, the evidence of defendants' guilt independent of the cell phone expert's opinion testimony was abundant. Among other things, those incriminating proofs as to Leach include the following:

- Leach's blood and DNA were found on the semiautomatic weapon that was recovered.

- One of the bullets that was recovered from the hospital came from that semiautomatic firearm.

- The casings that were recovered from the victim's vehicle came from that semiautomatic firearm.

- The victim's car window was broken on the night of the homicide, evidence that was consistent with the injury that Leach had on his hand that caused him to have the blood on his sweatshirt, on his jeans, and on his shoes, which apparently spread to the firearm.

- Video appears to show Leach getting out of Scott's silver Chevy Malibu and running towards the barbershop at the time of the shooting.

- Leach was stopped by the police in the area within ten minutes of the shooting.

- Cell phone records show that Pearson called Leach before the crime was committed.

As to Pearson, the incriminating evidence included, but was not limited to:

- Video surveillance from the Quick Stop convenience store shortly before the time of the murder, which appears to show Pearson clad in double hoodies, pants with unusual white markings, and dark shoes.

- Video of the shooting which appears to show Pearson at the barbershop.

- The above-mentioned cell phone records showing that Pearson called Leach before the shooting.

- Video that appears to show Pearson leaving the barbershop area briefly while he presumably retrieved the firearm and the mask, and then him returning into the camera frame at the barbershop.

- Video that appears to show two individuals leaving the scene after the shooting.

- The clothes Pearson was wearing that night, which appear to match the clothes in the video of the person discarding a revolver that matched at least two of the projectiles recovered from the victim.

- Pearson's DNA discovered in a mask found in the area.

20

Also, we note the guns were discarded immediately after the shooting at a location associated with defendants.

Given this abundance of incriminating evidence, we are unpersuaded that the admission of any net opinion testimony from Falcicchio—testimony that was not even mentioned in the State's closing argument—was "clearly capable of producing an unjust result."  R. 2:10-2.

B.

Lay Opinion Testimony by Detective Gonzalez

In his next argument, one not joined by Pearson, Leach contends the trial court erred in allowing one of the investigating officers, Detective Alex Gonzalez, to state improper lay opinion in describing his pursuit of Leach from the crime scene.  Specifically, Gonzalez recounted his observations of Leach running across the street into backyards.  The officer noted he thought those movements were "suspicious" and accordingly suspected that Leach was the shooter.  Defense counsel objected, arguing this was improper lay opinion disallowed under N.J.R.E. 701.  The court overruled the objection, reasoning that the officer's testimony "was based on his experience and his response in seeing somebody fleeing in that manner from what appears to be the scene of a crime that just occurred."  Leach argues the court's ruling was unsound under

21

Rule 701 and State v. McLean, 205 N.J. 438 (2011) (restricting certain lay opinions by testifying police officers who have not been designated as expert witnesses).

We discern no abuse of discretion in the court's evidentiary ruling. State v. Allen, 254 N.J. 530, 543 (2023). The detective's use of the term "suspicious," although subjective in nature, explained to the jury why he chased after Leach. Had the detective not used that term, it still would have been reasonable to infer from the video footage that there was a sensible and immediate justification for Gonzalez to pursue Leach. At worst, the terminology was surplusage. Any error in the court's ruling was harmless. R. 2:10-2; Allen, 254 N.J. at 552 (concluding that an officer's lay opinion was harmless in the factual setting presented).

C.

Trial Court's Statement to the Jury About the Reenactment Photos

Both defendants contend the trial court prejudicially erred in stating to the jurors that it had decided to allow the State to admit into evidence seven side-by-side photographs that "reenacted" the events at and near the crime scene. Defense counsel had objected to the admission of the photo display. The court conducted a Rule 104 hearing outside of the jury's presence and overruled the objection. When the jury returned, the court told the jurors that it had decided

the photos were admissible and that it was therefore "appropriate for the jury to view the photos."

Because neither defendant objected at trial to the court's statement to the jury, we apply a plain-error standard of appellate review to this issue. State v. Funderburg, 225 N.J. 66, 79 (2016). No plain error has been shown. The court's statement is innocuous. The court did not direct the jurors to deem the photo display persuasive or compelling. It simply told the jurors it was permissible to "view" the display. The judge did not scold defense counsel for making the objection. Defendants' claim of undue prejudice falls short under N.J.R.E. 403.

This is not a situation such as in State v. Ridout, 299 N.J. Super. 233, 239-40 (App. Div. 1997), in which the court made a detailed statement to the jury about why it had decided to admit certain evidence. Here, the court made no such detailed statement. It appropriately heard counsel's objection at sidebar and thereafter advised the jurors in a very succinct manner that they could view the evidence that had prompted the sidebar. The judge did not urge the jury to give the evidence any particular weight. Defendants' argument for a new trial on this basis is meritless.

D.

The Court's Flight Instruction as to Pearson

Pearson singularly argues the trial court further erred in charging the jury on flight as consciousness of guilt, over defense counsel's objection, "where the only evidence offered by the State to support the charge was that Pearson's cell phone was in South Carolina one month after the shooting and that he was arrested in South Carolina three months after the shooting for unrelated reasons." Seeking reversal of his convictions, Pearson contends this error deprived him of his constitutional rights to due process and a fair trial.

In particular, Pearson argues that

> there was "no nexus" between the alleged offense and his presence in South Carolina[;] there was no evidence as to when Pearson left New Jersey or arrived in South Carolina; there was no evidence that Pearson was consistently in New Jersey or that it would be irregular for him to be in South Carolina; there was no evidence that Pearson knew he was wanted by police in connection with the shooting before he left New Jersey.

The State responds that "[t]he timing of defendant's departure and his conduct in South Carolina when stopped by law enforcement [and his providing a fake name] provide a reasonable basis to support an inference that defendant's flight was . . . to avoid apprehension and a consciousness of guilt."

This court generally reviews "whether the jury was adequately instructed on the law de novo." Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 74 (2024). However, our review of the flight instruction here is for

24

abuse of discretion because Pearson does not challenge the legal correctness of the contents of the flight charge itself, but rather whether the trial court had a sufficient factual basis to deliver the flight instruction at all. See State v. Long, 119 N.J. 439, 499 (1990). We discern no misapplication of discretion in the trial court's decision to the issue the flight charge.

The pertinent context is as follows. At the charge conference, Pearson objected to the flight charge, arguing no one had testified that Pearson was on actual notice that the police were seeking to apprehend him. The judge rejected that argument, reasoning as follows:

> The court is going to give that flight charge based upon the testimony presented with the time specified in terms of when the first investigative detention order was obtained; the efforts detailed by Detective Kirsh in terms of visiting a number of locations, including most significantly, the defendant's mother's home and conferring with the mother going to [her home where the gun was found], as well as other individuals. I find that there's a sufficient basis in the record to find that the defendant was aware of the charges, or at least for the jury to consider that he was aware of the charges and consider whether the fact that he was detained in another—or found in another state and provided a fake name or false name when detained is sufficient for them to infer consciousness of guilt.

The judge's instructions to the jury, tracking the pertinent model jury charge, included the following on flight:

25

There has been some testimony in this case from which you may infer that Bashir Pearson fled shortly after the homicide of Tyshun Kearney. Mr. Pearson denies that the acts constituted flight. The question of whether Mr. Pearson fled after the commission of the crime is another question of fact for your determination. Mere departure from a place where a crime has been permitted does not constitute flight. If you find that Mr. Pearson, fearing that an accusation or arrest would be made against him on the charge involved in the indictment, took refuge in flight for the purpose of evading the accusation or arrest on that charge, then you may consider such flight in connection with all the other evidence in the case as an indication or a proof of consciousness of guilt.

Flight may be considered only as evidence of consciousness of guilt if you should determine that the defendant's purpose in fleeing was to evade accusation or arrest for the offense charged in the indictment. It is for you as judges of the facts to decide whether or not evidence of flight shows a consciousness of guilt and the weight to be given to such evidence in light of all the other evidence in this case.

As we have noted, Pearson does not challenge the language of the specific jury charge but instead urges that there was an insufficient evidentiary basis for the instruction. We conclude the trial court had an adequate foundation to issue the charge.

"An instruction on a permissible inference of consciousness of guilt flowing from flight is appropriate when there are 'circumstances present and unexplained which . . . reasonably justify an inference that it was done with a

26 <span>A-2475-22</span>

consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.'" State v. Latney, 415 N.J. Super. 169, 175-76 (App. Div. 2010) (quoting State v. Mann, 132 N.J. 410, 418-19 (1993)). "Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt." State v. Sullivan, 43 N.J. 209, 238 (1964). "The jury must be able to find departure and 'the motive which would turn the departure into flight.'" Latney, 415 N.J. Super. at 176 (quoting State v. Wilson, 57 N.J. 39, 49 (1970)). The "imperative [is] that 'each link in the chain of inferences leading to that conclusion [—i.e., consciousness of guilt of the crime charged—] is sturdily supported.'" Mann, 132 N.J. at 419 (quoting United States v. Beahm, 664 F.2d 414, 420 (4th Cir. 1981)). The circumstances need not constitute unequivocal proof of a consciousness of guilt, but it "must be intrinsically indicative of" such consciousness. State v. Randolph, 228 N.J. 566, 595 (2017).

In sum, the propriety of delivering a flight charge

> depends upon the degree of confidence with which four interferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.
>
> [Latney, 415 N.J. Super. at 176 (quoting Mann, 132 N.J. at 420).]

27

These criteria are met here. The State presented evidence that Pearson was actively being pursued by the police after the shooting, the police visiting his mother's home, his father's home, places he frequented, and other addresses associated with Pearson. Several detention orders were issued by the court as well. Law enforcement was actively looking for him. It is of no consequence whether Pearson knew that or not, as the caselaw supports the conclusion that the jury was free to infer his motive for leaving New Jersey as may be drawn from the evidence.

On April 12, 2020, Pearson was detained in South Carolina by the police and provided the officer with a false name. That act of deception bespeaks an intent to avoid identification, which is consistent with and rationally attributable to the active investigation of Kearney's murder in New Jersey. The circumstances "reasonably justify an inference that" defendant fled "with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.'" Id. at 175-76 (quoting Mann, 132 N.J. at 418-19.

Although defense counsel speculates that Pearson could have traveled to South Carolina for benign reasons and that he could have been oblivious to the fact that he was wanted for a homicide in New Jersey, the jurors were

28

appropriately advised, as "the judges of the facts," that it was their function to decide if those alternative explanations were credible.

In short, the model charge on flight was sufficiently justified in the circumstances presented.

E.

The "Certain Persons" Proceedings

Leach mistakenly contends the jury did not adjudicate the "certain persons" count of the indictment against him. However, the record made available to us includes a transcript confirming that the jury rendered a verdict on that additional count following the main trial. We therefore find no merit to this argument.

F.

Leach's Allegedly Excessive Sentence

Leach argues the sixty-year aggregate sentence he received for murder was excessive. He contends the sentencing court did not sufficiently explain why it applied the four aggravating factors it identified (one, three, six, and nine) under N.J.S.A. 2C:44-1(a) and did not give adequate weight to mitigating factor eleven, N.J.S.A. 2C:44-1(b), which concerns hardship on a defendant and his dependents. He further contends the court should have been more attentive to

29

the "overall fairness" of the sentence, citing State v. Torres, 246 N.J. 246, 268 (2021).

Little comment about this issue is necessary. It is well established that trial courts are afforded a considerable amount of discretion and deference in the realm of sentencing. In determining an appropriate sentence to be imposed on a convicted individual, the trial court is to consider the codified aggravating and mitigating factors identified at N.J.S.A. 2C:44-1(a) and (b), balance them, and explain how the sentence was determined. State v. Case, 220 N.J. 49, 65 (2014); State v. Fuentes, 217 N.J. 57, 72-73 (2014). If the trial court adheres to these principles, the sentence it imposes should be modified only if it "shock[s] the judicial conscience." State v. Roth, 95 N.J. 334, 365 (1984). As the Supreme Court instructed in State v. Bieniek, 200 N.J. 601, 612 (2010), when the trial court follows "the sentencing principles set forth in the Code and defined in our case law, its discretion should be immune from second-guessing. We grant to it the deference to which it is entitled under our traditional principles of appellate review of a criminal sentence."

Here, the sentencing judge adhered to these principles and more than amply explained his reasons for why the aggravating factors all pertained and why mitigating factor eleven did not warrant a shorter sentence. The trial court

noted that this homicide exemplified a "cold-blooded, premeditated, preplanned execution style hit."  The court also properly noted Leach's extensive criminal history of ten previous indictable convictions.  The court further noted defendant's two prison escapes and four violations of probation.  As for mitigation, the court took into account that defendant is the parent of seven children and recognized the "dramatic impact" a long sentence would have on their lives.  Nonetheless, the court concluded the aggravating factors clearly outweighed that mitigating factor.

The holding in <u>Torres</u>, 246 N.J. at 272, does not directly apply here because the court did not impose any consecutive sentences.  In any event, the record shows the court was mindful of the overall fairness of the custodial term it selected.

In short, the lengthy sentence imposed on Leach was well within the trial court's discretion and does not shock our conscience.

## G.

To the extent we may not have addressed them, we have considered all of the remaining points raised by each of the defendants.  They lack sufficient merit to warrant discussion.  <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

31

A-2475-22